Sara LARIOS, et al., Plaintiffs,

v.

Cathy COX, Defendant.

No. CIV.A. 1:03–CV–693–CAP.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 10, 2004.

Frank B. Strickland, Anne Ware Lewis, Strickland Brockington Lewis, Stacy Grant Freeman, Arnall Golden & Gregory, Atlanta, GA, E. M. Braden, phv, Amy M. Henson, phv, Baker & Hostetler, Washington, DC, for plaintiffs.

Dennis Robert Dunn, Thurbert E. Baker, Office of State Attorney General, Mark Howard Cohen, Troutman Sanders, David F. Walbert, Parks, Chesin & Walbert, Atlanta, GA, for defendant.

Before MARCUS, Circuit Judge, PANNELL and O'KELLEY, District Judges.

PER CURIAM.

This case presents several challenges to the congressional and state legislative reapportionment plans enacted by the Georgia General Assembly in 2001 and 2002. Specifically, in their First Amended Complaint, the plaintiffs contend that these plans violate a number of constitutional

and statutory provisions, including (1) the First Amendment, (2) 2 U.S.C. § 2c, (3) Article I, § 2, based on violation of the one person, one vote principle and transgression of the state's authority to dictate the times, places, and manner of congressional elections, and (4) the Equal Protection Clause, based on partisan gerrymandering, racial gerrymandering, violation of the one person, one vote principle, and the use of a combination of single- and multi-member districts in the state House of Representatives.

Pursuant to 28 U.S.C. § 2284(a), a three-judge court, consisting of Circuit Judge Stanley Marcus, District Judge Charles A. Pannell, Jr., and Senior District Judge William C. O'Kelley, was convened. In orders dated August 29, 2003, and October 15, 2003, we ruled on the defendant's motions to dismiss, ultimately dismissing the plaintiffs' 2 U.S.C. § 2 claim and the plaintiffs' Equal Protection claim challenging the combination of single- and multi-member districts in the state House, while allowing the remaining claims to go forward. Subsequently, in an order dated December 9, 2003, we granted the defendant's motion for summary judgment with respect to the plaintiffs' claims of partisan gerrymandering, violation of the First Amendment, and violation of Article I, § 2 by exceeding the state's authority to dictate the times, places, and manner of congressional elections; however, we denied both parties' motions for summary judgment with respect to the one person, one vote claims. In that same order, we stayed consideration of the plaintiffs' racial gerrymandering claim, which relates only to the 2001 and 2002 Senate plans, pending further development of the preclearance proceedings before the United States District Court for the District of Columbia in *Georgia v. Ashcroft,* Civil Action No. 01–2111.

Accordingly, this three-judge district court conducted a bench trial on January 6–9, 2004, concerning only the plaintiffs' one person, one vote challenges to Georgia's congressional and state legislative plans. We have now considered the evidence presented at trial, as well as the parties' deposition designations, stipulated facts, and proposed statements of fact and conclusions of law. Based upon a thorough review of the record and the applicable law, we conclude:

(1) Georgia's state legislative reapportionment plans plainly violate the one person, one vote principle embodied in the Equal Protection Clause because each deviates from population equality by a total of 9.98% of the ideal district population and there are no legitimate, consistently applied state policies which justify these population deviations. Instead, the plans arbitrarily and discriminatorily dilute and debase the weight of certain citizens' votes by intentionally and systematically underpopulating districts in rural south Georgia and inner-city Atlanta, correspondingly overpopulating the districts in suburban areas surrounding Atlanta, and by underpopulating the districts held by incumbent Democrats.

(2) Georgia's congressional reapportionment plan, though it deviates from population equality by a maximum of seventy-two persons, does not violate Article I, § 2 because the very small population deviations are supported by legitimate state interests in avoiding additional precinct-splitting and in ensuring that those precincts that are divided are split along easily recognizable boundaries wherever possible.

## I. Findings of Fact

### A. The Reapportionment Process in General.

The 2000 Decennial Census reported that the total population of the State of

Georgia was 8,186,453 persons. From 1990 to 2000, the population of north Georgia, which is largely comprised of the urban and suburban areas surrounding Atlanta, grew at a much faster rate than the population of south Georgia, which is primarily rural.[1] This population trend has remained consistent for the last several decades. In that same time period, the Republican party has also gained substantial strength in Georgia. In fact, the fastest-growing counties in the state over the past decade are Republican-leaning.

Based on its substantial population growth over the previous decade, the state was entitled to two additional congressional seats pursuant to 2 U.S.C. § 2a. Because of the addition of these new congressional seats and the substantial shifts in population around the state, it became necessary for Georgia to redraw its congressional districts. *See* U.S. Const. art. I, § 2; 2 U.S.C. § 2a. Likewise, the state's population growth had created population disparities in the state House and Senate districts, which needed to be corrected pursuant to Article III, § 2, ¶ 2 of the Georgia Constitution.

The Georgia General Assembly, therefore, met in two special sessions during August and September of 2001 for the purposes of redistricting the state's congressional seats and the state House and Senate seats. Prior to the 2001 special sessions, the House and Senate Reapportionment Committees had met both formally and informally on several occasions to prepare for the reapportionment process and to discuss various proposed plans. The committees also adopted guidelines for the reapportionment of congressional and legislative districts. These guidelines stated that the population of each state House and Senate district should be within 5% of the "ideal" district, so that the total deviation did not exceed 10%. Plaintiffs' Ex. 58. The guidelines also differed significantly from those adopted for the 1991 and 1981 redistrictings.[2]

The first special session of the General Assembly began on August 1 and ended on August 17, 2001. During the first special session, the General Assembly enacted a bill providing for the reapportionment of the state Senate ("the 2001 Senate Plan"). Then–Governor Roy Barnes signed the bill into law on August 24, 2001. During the first special session, the General Assembly also enacted a bill providing for the reapportionment of the state House of Representatives; however, that bill was subsequently vetoed by Governor Barnes.

The second special session of the General Assembly began on August 22 and end-

---

1. Although the parties agree about this general population trend, the various witnesses had different ways of defining the boundary between north and south Georgia. Plaintiffs' Expert Ronald Keith Gaddie spoke of the "fall line," or "gnat line," in generic terms, as the line "where the foothills below Appalachia [meet] the fertile, rolling lowlands that eventually [give] way to the expanses of the Sawgrass country in the southeastern corner of the state, or continue[] toward the Gulf Coast to the southwest and the Wiregrass country of Alabama." Report of Plaintiffs' Expert Ronald Keith Gaddie, Plaintiffs' Ex. 205, at 5. Others indicated that the line between north and south Georgia generally runs along Interstate 20. Test. of Sen. Brown, Tr. at 619;

Test. of Linda Meggers, Tr. at 728–29, 849–50. However, Linda Meggers testified that a more accurate fall line, and the one she uses in drafting maps, is one that runs along I–20 through Augusta, then comes down to the southwest above Jasper County, and continues into Troup County. Test. of Linda Meggers, Tr. at 849, 907.

2. The 1981 guidelines specifically required keeping counties together wherever possible. Plaintiffs' Ex. 58. The 1991 guidelines disallowed districts that were kept contiguous by "points of adjoining corners." Plaintiffs' Ex. 59. The 2001 guidelines contained neither of these requirements.

ed on September 28, 2001. During this second special session, the General Assembly enacted a second bill providing for the reapportionment of the state House of Representatives ("the House Plan"), as well as a bill providing for the reapportionment of the state's congressional districts ("the Congressional Plan"). Governor Barnes signed both bills into law on October 1, 2001.

Both houses of the General Assembly used Maptitude software to draw their redistricting plans. With the available technology and the use of this software, redistricting plans in 2001 could have been created with a deviation of 0 to 1 persons. The combination of technology and political data available to legislators and plan drafters also allowed for sophisticated analyses of political performance, so that maps could be drawn and then immediately analyzed politically. Thus, in drafting and considering their proposed maps, members of both houses relied on political performance projections, indicating the percentage of votes Democrats and Republicans would likely receive in future elections based upon an assessment of past election results.

Republicans attempted to influence the redistricting in several ways, with little success. They drew up alternative redistricting guidelines that required adherence to traditional redistricting criteria, such as district compactness and contiguity. Plaintiffs' Ex. 59. These guidelines were rejected by both the House and Senate Reapportionment Committees. Test. of Rep. Westmoreland, Tr. at 366–68; Test. of Sen. Brown, Tr. at 662. During the special sessions, Republican legislators participated in the redistricting process by drawing up proposed plans and working with some Democratic legislators to reach compromise plans. None of these Republican-sponsored plans was passed. Test. of Sen. Johnson, Tr. at 456; Test. of Rep.

Westmoreland, Tr. at 367–68, 374–75. During the special sessions, Republicans were not consulted by Democratic legislators regarding the redistricting plans. Test. of Rep. Westmoreland, Tr. at 401–02; Test. of Sen. Lee, Tr. at 511; Test. of Sen. Johnson, Tr. at 440; Test. of Bryan Tyson, Tr. at 976.

Because Georgia is a jurisdiction covered by Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, it was necessary for the state to have its reapportionment plans precleared by the federal government. To that end, the state filed a complaint for declaratory judgment in the United States District Court for the District of Columbia on October 10, 2001, seeking a declaration that the plans enacted during the 2001 special sessions did not have the purpose or would not have the effect of denying or abridging the right to vote on account of race or color. In an order dated April 5, 2002, the three-judge district court presiding over that action precleared the Congressional Plan and the House Plan, but refused to preclear the 2001 Senate Plan. *See Georgia v. Ashcroft*, 195 F.Supp.2d 25 (D.D.C.2002), *vacated*, —— U.S. ——, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003).

At the request of the State of Georgia, the three-judge district court retained jurisdiction of the case to permit the submission of a revised Senate redistricting plan that would satisfy the requirements of Section 5. Subsequently, the General Assembly enacted a bill providing such a revised plan ("the 2002 Senate Plan"). Governor Barnes signed the bill into law on April 11, 2002, and the district court precleared the new Senate Plan on June 3, 2002. *See Georgia v. Ashcroft*, 204 F.Supp.2d 4, 15–16 (D.D.C.2002). The 2002 Senate Plan is not substantially different from the 2001 Senate Plan, but it does make adjustments to several districts in order to remedy the perceived violations of Section 5. Its enact-

ing legislation specifically provides that it does "not repeal or amend the provisions of the [2001 Senate Plan]; and those provisions are merely suspended pending a final determination of their enforceability under the federal Voting Rights Act of 1965, as amended."

Meanwhile, the State of Georgia appealed the decision of the three-judge district court denying preclearance of the 2001 Senate Plan. On June 26, 2003, the United States Supreme Court vacated the district court's decision, holding that the district court's initial preclearance inquiry was overly narrow, and it remanded the case for further proceedings in light of its opinion. *Georgia v. Ashcroft*, 539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003). The district court has not yet issued a final decision on remand. Thus, because it is unclear whether the 2001 Senate Plan will ultimately be precleared and reinstated, the trial in this action considered only the 2002 Senate Plan now in effect, as well as the Congressional Plan and the House Plan already approved by the three-judge district court in the District of Columbia. *See generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998) (noting the Supreme Court's long-standing disapproval of advisory opinions); *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969) (same).

## B. The Individual Plans

### 1. The State Legislative Plans

The redistricting guidelines adopted by the House and Senate Reapportionment committees indicated that "[t]he population deviation of [each] plan should not exceed an overall deviation of 10%." Plaintiffs' Ex. 58, at 3. Based largely on these guidelines and on the instructions given in previous redistricting cycles, legislators and plan drawers for both houses believed there was a "safe harbor" of ± 5% in the reapportionment of state legislative districts and, therefore, that population deviations not rising to that level did not have to be supported by any legitimate state interest. Test. of Rep. Westmoreland, Tr. at 369–70, 409; Test. of Sen. Johnson, Tr. at 441–42; Test. of Sen. Brown, Tr. at 665–66; Test. of Linda Meggers, Tr. at 856–57.

The creators of the state plans did not consider such traditional redistricting criteria as district compactness, contiguity, protecting communities of interest, and keeping counties intact. Dep. of Joe Stanton at 21, 24; Test. of Linda Meggers, Tr. at 775–76, 871–76, 718–20; Test. of Sen Brown, Tr. at 633, 637, 664–65. Rather, they had two expressly enumerated objectives: the protection of rural Georgia and inner-city Atlanta against a relative decline in their populations compared with that of the rest of the state and the protection of Democratic incumbents.

### a. The House Plan

The House Plan consists of 180 members allocated to 147 districts, with 124 one-member districts, fifteen two-member districts, six three-member districts, and two four-member districts. In the redistricting plan immediately preceding the current plan, the House was comprised of 180 single-member districts. Based on the state's total population according to the 2000 Census, the ideal size of a single-member House district for one person, one vote purposes is 45,480 persons.

During the 2001 special sessions, the House Legislative and Congressional Reapportionment Committee, charged with coming up with a new electoral map for the House, had twenty-nine members: eighteen Democrats, including its chairman, vice-chairman, and secretary, and eleven Republicans. The chairman appointed a subcommittee, consisting entire-

ly of Democrats, to draw the House Plan. Test. of Rep. Westmoreland, Tr. at 367. In response, the Republicans created their own subcommittee, the House Republican Subcommittee on Congressional and Legislative Reapportionment and Redistricting, and adopted the substantive redistricting guidelines that the Republicans had unsuccessfully proposed for the House to use. Test. of Rep. Westmoreland, Tr. at 367–68.

The legislative reapportionment staff, and particularly Linda Meggers, worked with individual House members to draft the House Plan. In drawing the districts, Ms. Meggers took into account the political desires of various Democratic incumbents in order to achieve the ninety-one votes required to pass a plan. This was particularly difficult in south Georgia and urban Atlanta, as the districts in those areas were vastly underpopulated at the beginning of the redistricting process and the incumbents in those districts struggled to maintain as many seats as possible. Additionally, incumbents in all areas of the state sought to limit the expansion of their districts to what was considered legally necessary, i.e., a population deviation of ± 5%. Test. of Linda Meggers, Tr. at 738–40. At no time did the drafters of the plans nurture the ambition of drawing maps as close to equal in population as was reasonably practicable. In the end, many south Georgia incumbents who had seniority over other House members used their political influence to preserve the representation of rural interests as much as possible, resulting in greater negative population deviations in these areas and, consequently, greater positive population deviations in other areas. Nonetheless, south Georgia still lost seven House districts in the reapportionment plan that ultimately passed.

The resulting House Plan has a total population deviation range of 9.98% and an average deviation of 3.47%. The House districts deviate from ideal equal population by a range of +4.99% to –4.99%, with the largest district having 176,939 persons (in a four-member district) and the smallest district having 43,209 persons. Notably, ninety of the 180 House seats (50.00%) are in districts with population deviations greater than ± 4%. Sixty seats (33.33%) are in districts with deviations greater than ± 4.5%, and twenty seats (11.11%) are in districts with deviations greater than ± 4.9%. The most underpopulated districts are primarily Democratic-leaning, and the most overpopulated districts are primarily Republican-leaning. Moreover, most of the districts with negative deviations of 4% or greater are located either in south Georgia or within inner-city Atlanta. Plainly, redistricting plans could have been easily drawn with smaller population deviations; in fact, some such plans were offered for consideration but were summarily rejected.

The House Plan splits eighty counties into 266 parts. The plan paired forty-two incumbents, including thirty-seven of the seventy-four incumbent Republicans (50% of the Republican caucus), but only nine of the 105 incumbent Democrats (less than 9% of the Democratic caucus). In the 2002 general election, the first general election following enactment of the plan, the composition of the House went from 105 Democrats, 74 Republicans, and 1 Independent to 107 Democrats, 72 Republicans, and 1 Independent.

### b. The Senate Plan

The Georgia Senate consists of fifty-six members. The Georgia Constitution requires that the state senate be composed of single-member districts. Therefore, based on the state's total population, the ideal size of a Senate district for one person, one vote purposes according to the 2000 Census is 146,187 persons.

The Senate Reapportionment Committee, chaired by Senator Tim Golden, was responsible for coming up with a new electoral map in 2001. The committee was made up of twenty-four members: twenty Democrats and four Republicans. Test. of Sen. Lee, Tr. at 494. Senator Eric Johnson, the Senate's Republican minority leader, requested a position on the committee but was denied. Test. of Sen. Johnson, Tr. at 439. Senator Golden appointed a five-member subcommittee, entirely Democratic and chaired by Senator Robert Brown, to devise a redistricting plan. Stip. Fact 28.

To create a plan, Senator Brown worked with Joseph Stanton and other staff of the legislative reapportionment office, who offered technical assistance. Senator Brown focused his redistricting efforts on five primary goals: (1) drawing districts with population deviations of no greater than ± 5%; (2) ensuring that the districts did not retrogress in violation of Section 5 of the Voting Rights Act; (3) protecting or enhancing opportunities for Democrats to be elected; (4) allowing rural southern Georgia to hold on to as many seats as possible; and (5) obtaining the twenty-nine votes required to pass a plan.

The resulting 2002 Senate Plan has a total population deviation of 9.98% and an average deviation of 3.78%. The Senate districts deviate from ideal equal population by a range of +4.99% to −4.99%, with the largest district having 153,489 persons and the smallest district having 138,894 persons. Thirty-seven of the fifty-six districts (66.07%) have population deviations greater than ± 4%. Thirty-one districts (55.36%) have deviations greater than ± 4.5%, and sixteen districts (28.57%) have deviations greater than ± 4.9%. Not surprisingly, the most underpopulated districts are primarily Democratic-leaning, and the most overpopulated districts are primarily Republican-leaning. Moreover, all of the districts with negative deviations of more than 4% are situated either in south Georgia or within inner-city Atlanta. As in the House, redistricting plans with smaller population deviations were offered for consideration, but were summarily rejected.

The 2002 Senate Plan splits eighty-one counties into 219 parts. The plan also paired twelve incumbents, including ten of the twenty-four incumbent Republicans (42% of the caucus) but only two of the thirty-two incumbent Democrats (6% of the caucus). In the 2002 general election, the first general election following enactment of the plan, the composition of the Senate went from thirty-two Democrats and twenty-four Republicans to thirty Democrats and twenty-six Republicans. Following the election, four Democrats switched allegiance to the Republican Party, giving the Republicans control of the Senate by a margin of 30–26.

c. **The favoring of rural and inner-city interests**

Both the explicit admissions of witnesses for the defendant and the circumstantial evidence of the plans themselves leave no doubt that a deliberate and systematic policy of favoring rural and inner-city interests at the expense of suburban areas north, east, and west of Atlanta led to a substantial portion of the 9.98% population deviations in both of the plans. Much of the testimony at trial centered around the distinction between "the two Georgias": namely, the predominantly rural areas of south Georgia and the urban and suburban areas surrounding Atlanta in north Georgia. The historic struggle between these two areas of the state, with their differing views on water usage, education, transportation, economic development, and other issues, has affected Georgia politics for the last several decades and cuts across party lines. *See* Plaintiffs' Ex. 205, Report of

Expert Ronald Gaddie ("Gaddie Report") at 5–7; Test. of Plaintiffs' Expert Ronald Keith Gaddie, Tr. at 123–25; Test. of Rep. Westmoreland, Tr. at 411–12; Test. of Sen. Brown, Tr. at 621–23; Test. of Linda Meggers, Tr. at 749–51. At the same time, the population of north Georgia has increased at a significantly faster rate than that of south Georgia. Test. of Sen. Brown, Tr. at 621; Test. of Linda Meggers, Tr. at 729, 848–50. As a consequence, the rural areas of south Georgia have been slowly but continuously losing their political influence, particularly in the state legislature, because of their proportional loss of seats. Test. of Sen. Brown, Tr. at 621; Test. of Linda Meggers, Tr. at 729; Test. of Bryan Tyson, Tr. at 958.

In an unambiguous attempt to hold onto as much of that political power as they could, and aided by what they perceived to be a 10% safe harbor, the plans' drafters intentionally drew the state legislative plans in such a way as to minimize the loss of districts in the southern part of the state. *See, e.g.,* Test. of Sen. Brown, Tr. at 619 ("[W]hen I looked at the southern part of the state, there was one paramount concern, and that was that we not lose any more districts than would absolutely be necessary."); *id.* at 652 ("[Y]ou had the desire on the part of the rural senators to have as many rural senators as possible."); Test. of Linda Meggers, Tr. at 739 ("[T]hey didn't want to lose anymore representation out of rural south Georgia than they had to."); *id.* at 743 ("[The negative deviations] are in south Georgia because those folks wanted to minimize their loss of power."). In other words, the drafters

redrew the majority of south Georgia's districts, which were generally very underpopulated going into the reapportionment process, by taking on only as much area as was needed to get within a –5% population deviation. Test. of Sen. Brown, Tr. at 651 ("[O]nce they would come within that range as far as the population is concerned, that would be as far as they would need to go. And when you consider that if you take up even more population, that means that you are constricting the number of districts that you are going to have in the south Georgia area."); Test. of Linda Meggers, Tr. at 730 ("I took all of south Georgia and lassoed it in as if it were one big district, and we had the population, and the deviation, and how many seats. So I knew how many seats I could draw and be within five percent.").

By doing this, the plans' drafters managed to contain the loss of seats in southern Georgia to seven seats in the House and two seats in the Senate. Test. of Linda Meggers, Tr. at 729 ("[W]ith the numbers we had, we knew that [at] a minimum they were going to lose seven seats, and my job was to keep from doing that. . . . They wanted me to help them see if they could draw a plan that held it to seven, if at all possible."); *id.* at 752–54 (noting that seven House seats were lost in the southern part of the state); Test. of Sen. Brown, Tr. at 619 ("When I initially looked at it, I thought we were going to probably lose somewhere in the range of maybe three to four districts, and it turned out we did not lose that many."); *id.* at 658 (noting that only two Senate seats were lost in the southern part of the state).[3]

---

**3.** To a lesser but discernible extent, the plans' drafters also attempted to prevent the loss of seats—particularly in an effort to protect incumbents—in inner-city Atlanta, which is also lagging behind other areas of the state in terms of population growth. Test. of Sen. Brown, Tr. at 630–31. Creating population deviations of more than 4% in these districts

was not necessary to prevent retrogression in violation of the Voting Rights Act. The Republican Senate leadership proposed plans that did not reduce the number of majority-minority districts and still contained maximum deviations far below 9.98%. *See* Plaintiffs' exs. 68–72; Test. of Rep. Westmoreland, Tr. at 453–56. Moreover, the defendant has never

A study of the patterns of deviation further illustrates how the population deviations were created. What is most striking is a comparison of the districts that were the most underpopulated and overpopulated coming into the reapportionment process and those that were the most underpopulated and overpopulated in the plans that ultimately passed. The same pattern exists in all of the charts: the most underpopulated areas are located almost exclusively in rural south Georgia and inner-city Atlanta, and the most overpopulated areas are located almost exclusively in the areas of north Georgia that encircle Atlanta. *See* Plaintiffs' Exs. 3 (pre-redistricting Senate figures), 6 (2002 Senate Plan figures), 77 (pre-redistricting House figures), 83 (House Plan figures).

Thus, it is clear that rather than using the reapportionment process to equalize districts throughout the state, legislators and plan drafters sought to shift only as much population to the state's underpopulated districts as they thought necessary to stay within a total population deviation of 10%. And if the population trend that has transformed the state over the last several years continues, the vote dilution suffered by individuals living in significantly overpopulated districts is likely to compound over the course of this decade.

### d. Incumbent Protection

An examination of the entire record also leads us to find that the other major cause of the deviations in both plans was an intentional effort to allow incumbent Democrats to maintain or increase their delegation, primarily by systematically underpopulating the districts held by incumbent Democrats, by overpopulating those of Republicans, and by deliberately pairing numerous Republican incumbents against one another. Substantial circumstantial evidence leads us to this conclusion. *See, e.g.,* Test. of Plaintiffs' Expert Ronald Keith Gaddie, Tr. at 46, 48–49, 81 (concluding, based on a study of the maps, that the population deviations in the state legislative plans were used for political purposes); Test. of Plaintiffs' Expert Clark Bensen, Tr. at 239–41 (same).

While Democratic incumbents who supported the plans were generally protected, Republican incumbents were regularly pitted against one another in an obviously purposeful attempt to unseat as many of them as possible. In the House Plan, forty-seven incumbents were paired, including thirty-seven Republicans, which was 50% of the Republican caucus, but only nine Democrats, comprising less than 9% of that caucus (as well as one Independent).[4] Gaddie Report at 26, Table 8.2; Bensen Report at House App. Tab 12. Because six of the twenty-one districts involved were multi-member districts, the end result was that a maximum of twenty-eight of the paired incumbents could be re-elected, and the remaining nineteen would be unseated. Gaddie Report at 26. Similarly, the 2002 Senate Plan included six incumbent pairings: four Republican–Republican pairings and two Republican–Democrat pairings. *Id.* at Table 8.1; Bensen Report at 2002 Senate Plan Section p. 6, 2002 Senate Plan App. Tab 12. In the 2002 general election, eighteen Republican incumbents in the House and four Republican incumbents in the Senate lost their seats due to the pairings, while only three

---

claimed that the population deviations were necessary to achieve compliance with the Voting Rights Act.

**4.** We note that former Representative Collins is listed as an Independent in Dr. Gaddie's report and as an Independent Republican in Dr. Bensen's report. Gaddie Report at Table 8.2, Bensen Report at House App. Tab 12. However, for purposes of this opinion, former Representative Collins is considered a Republican.

Democratic incumbents in the House and no Democratic incumbents in the Senate lost seats this way. Gaddie Report at 26–27.[5]

The numbers largely speak for themselves, but the shapes of many of these districts and the resulting pairings further indicate that there was an intent not only to aid Democratic incumbents in getting re-elected but also to oust many of their Republican incumbent counterparts. For example, one Republican senator (Senator Cable) was drawn into a district with a Democratic incumbent who ultimately won the 2002 general election, while an open district was drawn within two blocks of her residence. Test. of Sen. Johnson, Tr. at 444. Additionally, two of the most senior Republican senators, Senators Burton and Ladd, were drawn into the same district, *id.* at 444–45; and a Republican House member, Representative Kaye, who was generally disliked by several of the Democratic incumbents, was paired with another representative in an attempt to unseat him, Test. of Linda Meggers, Tr. at 900–01. Finally, many of the districts that paired Republicans are not only oddly shaped but also overpopulated (for example, House Districts 3, 30, 46, 85, 127, and 137, which have positive deviations of 4.74%, 4.57%, 4.24%, 4.30%, 4.80%, and 4.45%, respectively, and Senate Districts 17, 40, 49, and 56, which have positive deviations of 4.97%, 4.84%, 4.61%, and 4.97%, respectively), thus also suggesting that the districts were drawn to force Republican incumbents to run against each other and to draw in as many Republican voters as possible in the process.[6]

Most of the political design in the map drawing occurred at a more basic level, with individual Democratic incumbents negotiating with the plans' drafters to draw them the safest possible districts, i.e., districts that retained many of their previous supporters and that took on as few new constituents as was perceived to be legally necessary. Test. of Sen. Brown, Tr. at 622–26, 642, 647–50; Test. of Linda Meggers, Tr. at 711–12, 732, 735–40, 759–65. In fact, the evidence indicates not only that Democratic incumbents attempted to draw districts that would enhance their own prospects at re-election and further their other political ends (such as building up a support base for a future run for Congress, *see, e.g.,* Test. of Linda Meggers, Tr. at 757, 759, 761, 764–66), but also that they targeted particular Republicans to prevent their re-election.

Perhaps the most striking example of the manipulation of population deviations at the district level, however, may be what occurred in House District 137, which drew in two Republican incumbents. This district has a positive deviation of 4.45%, although it is located in the southern part of the state, where the vast majority of districts are underpopulated. It borders Districts 132, 133, 135, 136, 138, 139, 140, 141, and 144, which have population deviations of –4.78%, –4.63%, –4.60%, –4.68%, +3.10%, –3.11%, –4.77%, –4.94%, and +2.21%, respectively.[7]

---

5. One Independent member of the House also lost a seat due to the pairings. *Id.*

6. Almost all of these districts border at least one underpopulated district. Several of the districts with Republican–Republican pairings easily could have been less overpopulated (and some pairings eliminated) had the plan drafters transferred some of the population from those districts into neighboring districts.

7. While the plaintiffs' partisan gerrymandering claim has been dismissed, the evidence presented by the plaintiffs regarding an intent to gerrymander districts—for example, the comparisons of core retention figures and of incumbent pairings for Republican and Democratic representatives—also indicates an intent to use population deviations to further advance the same goals.

These efforts at selective incumbent protection through the use of population deviations and creative district shapes led to a significant overall partisan advantage for Democrats in the electoral maps. Republican-leaning districts are vastly more overpopulated as a whole than Democratic-leaning districts. Indeed, by one measure, the House Plan contains fifty overpopulated and thirteen underpopulated Republican-leaning districts, compared to only twenty-two overpopulated and fifty-nine underpopulated Democratic-leaning districts, and the 2002 Senate Plan contains nineteen overpopulated and seven underpopulated Republican-leaning districts, compared to only eight overpopulated and twenty-two underpopulated Democratic-leaning districts. Bensen Report at House App. Tab 8, 2002 Senate App. Tab 8. Moreover, as we have noted, the large positive deviations often occurred in districts that paired Republican incumbents (such as House Districts 3, 30, 46, 85, 127, and 137 and Senate Districts 17, 40, 49, and 56).

### e. Traditional Redistricting Criteria

The Supreme Court has specifically detailed a number of state policies that, when applied in a consistent and nondiscriminatory manner, can justify some level of population deviation. In *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), discussing population deviations, the Court indicated the kind of policies that might permit some deviation from perfect population equality: "Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Id.* at 740, 103 S.Ct. at 2663. The last of these, incumbent protection, has already been discussed at length. The other policies were not causes of the population deviations in the House Plan and 2002 Senate Plan; nor indeed, were they priorities at all in drafting the plans. In fact, the defendant has never claimed that they were.

First, the population deviations in the House Plan and the 2002 Senate Plan did not result from any attempt to create *compact* districts. One can discern that just by looking at the maps themselves—in particular, at districts such as House Districts 13, 47, 87, 127, and 137 and Senate Districts 16, 17, 24, 28, and 51. Additionally, a simple comparison of these districts to the population data reveals that many of the most oddly-shaped districts in the plans have the largest positive deviations. For example, considering only the ten districts just mentioned, House Districts 13, 47, 87, 127, and 137 have positive deviations of 3.99%, 2.22%, 4.93%, 4.80%, and 4.45%, respectively; and Senate Districts 16, 17, 24, 28, and 51 have positive deviations of 4.97%, 4.97%, 4.25%, 4.97%, and 4.99%, respectively.

A more sophisticated analysis of district compactness, calculated by comparing the relative length of the perimeter of a district to its area ("the Perimeter–to–Area measure") or by measuring the space occupied by a district as a proportion of the space of the smallest encompassing circle ("the Smallest Circle score"), also demonstrates that the level of compactness is significantly smaller in the House Plan and the 2002 Senate Plan than in 1996 plans studied by plaintiffs' expert Dr. Gaddie. Gaddie Report at 13–14. For either method of calculating compactness, a value of one indicates perfect compactness and is achieved where a district is a circle. *Id.* at 14. In this instance, the average Perimeter–to–Area measure for districts in the House Plan is .24, as compared to .28 in the 1996 plan; and the average Smallest Circle score for districts in the House Plan

is .38, as compared to .40 in the 1996 plan. *Id.* at Table 4.1. An even starker contrast exists in the 2002 Senate Plan, which has an average Perimeter–to–Area measure of .16, down from .27 in the 1996 plan, and an average Smallest Circle score of .35, down from .42 in the 1996 plan. *Id.*

The defendant does not argue that compactness was a consideration in the reapportionment process. Senator Brown, a principal architect of the 2001 and 2002 Senate Plans, never mentioned compactness as a factor in drawing districts; and Linda Meggers, the principal drafter of the House Plan, testified that redistricting decisions in Georgia are not guided by measures of compactness. Test. of Linda Meggers, Tr. at 775–76, 875–76. Other witnesses similarly testified that compactness was not considered in drawing the maps. *See. e.g.,* Dep. of John G. Kirincich, Jr. at 76, 216; Dep. of Douglas M. Moore at 30; Dep. of Joe Stanton at 24, 50–51, 93, 99, 106–07. Nor was compactness specifically mentioned in the guidelines for redistricting adopted by the House and Senate Reapportionment Committees. Plaintiffs' Ex. 58.

Second, *district contiguity* was not a real concern among plan drafters and legislators. *See, e.g.,* Test. of Sen. Brown, Tr. at 664–65 (stating that he was "never quite sure" what contiguity meant); Test. of Linda Meggers, Tr. at 871–73 (indicating that the definition of "contiguous" was relaxed prior to the 2001 reapportionment process, thus allowing for the use of point contiguity). It is also clear that any regard plan drafters may have had for contiguity could not explain the 9.98% population deviations in the plans. While all of the districts are technically contiguous (as required by state law), many districts achieve that designation through the use of water contiguity, which is predicated on the assumption of line-of-sight across a lake or other body of water, or touch-point contiguity, which is predicated on facing corners in a checker-board like fashion. Water contiguity was necessary to keep together six districts in the House Plan (specifically, Districts 77, 127, 128, 129, 141, and 146) and seventeen districts in the 2002 Senate Plan (specifically, Districts 1, 3, 11, 12, 13, 14, 18, 19, 20, 21, 25, 26, 29, 45, 49, 51, and 54). Touch-point contiguity is found in five districts in the House Plan (specifically, Districts 3, 72, 96, 114, and 120) and in one district in the 2002 Senate Plan (specifically, District 18). Gaddie Report at 15–16, Tables 5.1, 5.2; Report of Plaintiffs' Expert Clark Bensen, Plaintiffs' Ex. 204 ("Bensen Report"), at 3–5. Furthermore, the majority of the districts that are contiguous only by reason of water or touch-point contiguity are overpopulated: sixteen of the twenty-three districts with water contiguity have deviations of more than ± 4%, and two of the six districts with touch-point contiguity have deviations of more than ± 4.5%. Gaddie Report at 16.[8]

Third, it is also clear that the drafters of the plans were almost entirely unconcerned about *keeping counties whole,* and that the 9.98% total population deviations cannot be explained by efforts to keep counties together. Both Senator Brown and Linda Meggers testified that as the state has become more diverse and more mobile, county lines have become less and less relevant on a statewide level. Test. of Sen. Brown, Tr. at 633 ("Georgia is a much more mobile state. The old county unit system that once existed has less relevance to state policy, state governmental interests than it once did."); *id.* at 637 (stating

---

8. In some cases, water and touch-point contiguity may have been used to keep counties or precincts whole while attempting to satisfy the political wishes of individual legislators. Test. of Linda Meggers, Tr. at 759, 763–64.

that "I do not share [the] opinion" that splitting counties negatively impacts local interests); Test. of Linda Meggers, Tr. at 718–20 (stating that counties are becoming less important as political and social units than they used to be).

A study of the maps also reveals that their drafters were not concerned about splitting counties. The House Plan actually splits eighty of the state's 159 counties into 266 parts. In contrast, the 1996 plan split only seventy-two counties, even though that plan contained 180 districts and the current plan contains only 147 (due to the use of multi-member districts). Moreover, in the 2002 Senate Plan, eighty-one counties are split into 219 parts, whereas the 1996 plan split only forty-three counties. In fact, some counties are split into multiple parts, such as Cobb County (thirteen parts in the House Plan and six parts in the 2002 Senate Plan), DeKalb County (twelve parts in the House Plan and seven parts in the 2002 Senate Plan), Fulton County (sixteen parts in the House Plan and eight parts in the 2002 Senate Plan), and Gwinnett County (nine parts in the House Plan and seven parts in the 2002 Senate Plan). Though part of this division is a result of highly populated counties that cannot be entirely encompassed within a single district, some counties are split into multiple parts even in the more rural areas of the state. For example, Bartow County, which has 75,000 residents, is split into three House Districts and four Senate Districts; and Bryan County, which has just 23,417 resi-

dents, is split into five House Districts and three Senate Districts. Gaddie Report at 19, 20, Tables 6.2, 6.3. Additionally, forty-two of the counties split in the House Plan, and sixty-eight of counties split in the 2002 Senate Plan, have populations smaller than the ideal district size. *Id.* at 19.[9]

There is no correlation between county splits and attempts to reduce population disparities, as sixty-five of the counties split in the House Plan and seventy-one of the counties split in the 2002 Senate Plan contain at least one district with a population deviation of ± 4% or greater. *Id.* Moreover, many of these high-deviation districts are located adjacent to other districts whose populations could be transferred so as to reduce the deviations in both districts and, in some cases, to eliminate the county split at the same time. *Id.;* Test. of Plaintiffs' Expert Ronald Keith Gaddie, Tr. at 70–71.

Finally, *preserving the cores of prior districts* was not mentioned in the guidelines for redistricting adopted by the House and Senate Reapportionment Committees. Plaintiffs' Ex. 58. To the extent that the preservation of district cores may have been a goal of the drafters of the House and Senate Plans, they tried only to maintain the cores of Democratic-leaning districts. The plan drafters drew districts for Democratic incumbents who supported the plans, allowing them to retain as much of their base as they wanted and to take on as little new territory as possible, and simply gave Republican incumbents what

---

9. The current plans also split more cities than the previous plans. The House Plan splits 82 cities into 184 parts, whereas the benchmark (1998) plan split 49 cities into 109 parts. The 2002 Senate Plan splits 102 cities into 254 parts, whereas the benchmark plan split 78 cities into 208 parts. Test. of Plaintiffs' Expert Clark Bensen, Tr. at 237–38.

The population deviations also did not result from an interest in not splitting precincts.

Indeed, the House Plan splits about 270 precincts and the Senate Plan splits 159 precincts. Test. of Bryan Tyson, Tr. at 932. While preservation of precinct lines may have been a marginal concern in drawing the state legislative plans, it cannot explain the plans' 9.98% deviation. And the defendant does not argue otherwise.

was left, i.e:, "remnant districts." Test. of Sen. Brown, Tr. at 623–26, 634, 647–49; Test. of Linda Meggers, Tr. at 712, 740, 760, 905–06.

The plans' core retention figures, which represent the extent to which constituencies are maintained or disrupted by a new map, amply demonstrate that core retention was not a concern in the redistricting process. Core retention can be viewed in one of two ways: (1) in terms of the largest core of a prior district that is included in a successor district, or (2) in terms of the district core of each incumbent located in a district. Gaddie Report at 22–23. In the House Plan, the average largest district core is 70.84% for single-member districts, 42.97% for two-member districts, 28.27% for three-member districts, and 23.80% for four-member districts; and the average incumbent core is 65.88% for single-member districts, 32.18% for two-member districts, 22.32% for three-member districts, and 23.72% for four-member districts. *Id.* at 23–24, Table 7.3.[10] In the 2002 Senate Plan, the average largest core is 63.39%, and the average incumbent core is 58.22%. *Id.* at 23, Table 7.2.

To the extent that the map drawers had any concern for retaining the cores of prior districts, a comparison of Republican versus Democrat core retention reveals the extremely inconsistent manner in which this factor was applied. Despite the fact that Republican areas of the state have grown at a faster rate than have Democratic areas (so that in a neutral plan Republican incumbents would be expected to take on fewer new constituents), core retention figures were significantly lower—especially in terms of incumbent cores—for Republican than for Democratic incumbents. In the House, Republicans in single-, two-, and three-member districts retained an average of 56.73%, 28.36%, and 17.95% of their core districts, respectively, whereas Democrats retained 73.93%, 38.48%, and 27.56%, respectively.[11] *Id.* at 24, Table 7.3. Similarly, in the Senate, Republicans retained an average of 45.67% of their core districts, while Democrats retained 66.60%. *Id.* at 23, Table 7.2.

After thorough review of the entire record in this case, we cannot escape the conclusion that the population deviations were designed to allow Democrats to maintain or increase their representation in the House and Senate through the underpopulation of districts in Democratic-leaning rural and inner-city areas of the state and through the protection of Democratic incumbents and the impairment of the Republican incumbents' reelection prospects. The twin goals of regional favoritism and protection of Democratic incumbents led to the underpopulation and overpopulation of certain districts. Rural and inner-city Atlanta districts tended also to be Democratic-leaning and to be represented by Democrats, so the negative population deviations in these districts were ultimately the result of design. Likewise, suburban districts in northern Georgia tended to be Republican-leaning and to have Republican representation in the General Assembly, and so these districts were overpopulated.

## 2. The Congressional Plan

Prior to the 2000 census, the State of Georgia had eleven congressional districts.

---

**10.** Core retention in the House Plan is largest in single-member districts. This is the opposite of what one might expect in a neutral plan. Because two-, three-, and four-member districts generally encompass more territory, they should, in a neutral plan, retain larger district cores. Similarly, incumbents in such districts should hold onto larger cores of their prior districts.

**11.** No Republican incumbents were placed in four-member districts. Democratic incumbents placed in four-member districts retained an average of 23.72% of their core districts. Gaddie Report at Table 7.3.

Those districts were drawn in 1995 by a three-judge court in the Southern District of Georgia after the Georgia General Assembly was unable to fashion a constitutional plan. *Johnson v. Miller*, 922 F.Supp. 1556 (S.D.Ga.1995) (three-judge court), *aff'd sub nom. Abrams v. Johnson*, 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997). The range in population deviation for the court-drawn plan was from –0.23% in District 2 to + 0.12% in District 3, for an overall deviation of 0.35% and an average deviation of 0.11%. The 2000 census figures indicated that the state had gained more than 1.7 million people in the preceding ten years, resulting in the allocation of two additional congressional seats. With a population of 8,186,453 people, Georgia was entitled to thirteen congressional districts, each with an ideal population of 629,727 persons.

Congressional redistricting in Georgia is a collaborative effort between the state House of Representatives and the state Senate. The House and Senate each passed a redistricting plan, both of which were referred to a conference committee composed of six members, three each from the House and Senate. There were no Republican representatives on the conference committee. On the final day of the special session, the conference committee sent a compromise redistricting plan back to the House and Senate. Each chamber passed the plan, and it was signed by the governor.

The new Congressional Plan resulted in a total population deviation of seventy-two people, approximately 0.01% of the population of an ideal congressional district. The most overpopulated district, District 9, has thirty-five more people than the perfectly apportioned district, and the most underpopulated district, District 4, has thirty-seven fewer people than the perfectly apportioned district. The only district that is within one person of the ideal number is District 5, with a population deviation of zero. The average district's absolute deviation was seventeen people, or 0.003% of an ideal district. Senator Brown testified that deviations, and their correlation with political advantage, were not considered when the congressional maps were created. Indeed, it is difficult to imagine how deviations this small could amount to a significant advantage for any party. After the 2002 elections, the first held under the new plan, Republicans controlled eight of the congressional seats compared to the Democrats' five seats.

The deviations that exist in the Congressional Plan could have been reduced or eliminated all together. Linda Meggers, who was directly involved with drafting both the House plan that was sent to the conference committee and the final plan that emerged from the conference committee, testified that it would be possible to draw a congressional map for the State of Georgia with a population deviation of plus or minus one person. Test. of Linda Meggers, Tr. at 881. In fact, such a map could have been created in one day, even while ensuring compliance with the Voting Rights Act. *Id.* at 881–82. Ms. Meggers further testified that she could create such a plan that split fewer counties than the present plan, is more compact than the present plan, and divides fewer voting precincts than the present plan. *Id.* at 882–83.

It is clear that politics and the individual concerns of various legislators had an impact on the congressional redistricting process. Ms. Meggers testified that former Senate Majority Leader Walker insisted on a district in east Georgia that he hoped would lead to a successful congressional campaign for his son. *Id.* at 781–83. The resulting district, District 12, runs from Clarke County down the eastern border of the state to Bryan County. *Id.* at 783.

Ms. Meggers also testified about the political battles that led to the creation of District 13, an irregular-shaped district that touches parts of eleven counties surrounding the city of Atlanta. District 13 resulted from Senator Hecht's desire to create a district from which he felt he could mount a successful congressional campaign. *Id.* at 782–87. As more senators realized that Senator Hecht was attempting to create such a district, they too began to assert influence on the proposed District 13, drawing in different areas they felt would be advantageous in the event they attempted to launch their own congressional careers. *Id.* at 784–87. These considerations drove not only the shape of District 13 but also the shape of the entire map. *Id.* As each vote in the Senate would be of critical importance, the drafters could not afford to alienate any one senator by disregarding his or her personal desires. *Id.*

Ms. Meggers further testified that representatives from both the House and the Senate wanted a "middle Georgia" congressional district, designed to protect the interests of groups from that area of the state. *Id.* at 782–88. That district ended up being District 3, which runs across the middle of the state, from Marion County in the west to Evans County in the east. *Id.* at 788. Former Speaker of the House Murphy, who was represented by Congressman Barr in the former District 7, wanted a new district drawn in that area that would be more competitive for Democrats and more challenging for Congressman Barr. *Id.* at 789–90.

Senator Eric Johnson, a Republican, similarly testified that passing a congressional plan is an extraordinarily political process because so many legislators have aspirations of being elected to Congress and, therefore, have an interest in crafting a district they consider politically desirable. Test. of Sen. Johnson, Tr. at 463.

Senator Johnson stated that during the redistricting process, nobody mentioned a desire to avoid splitting counties or precincts; there was no real effort to keep communities of interest together; there was no discussion of making compact districts; nobody discussed having district or precinct lines follow natural or man-made boundaries; and there was no effort to protect incumbents. *Id.* at 464–65. Senator Johnson gave testimony substantially similar to that of Ms. Meggers regarding Senator Walker's desire to craft a congressional district from which his son might pursue a campaign and Speaker Murphy's desire to draw himself out of Congressman Barr's district. *Id.* at 468, 470.

After the politicians crafted a version of the congressional map, Ms. Meggers and her staff were left to work out the details. The State of Georgia did not reduce the population deviations to zero because to do so would have required either splitting more precincts or further splitting existing split precincts along something other than an easily recognizable boundary. Test. of Linda Meggers, Tr. at 804–07. In constructing the final map, when Ms. Meggers had to split a voting precinct, she tried to do so along only an obvious natural or man-made boundary. *Id.* For example, she would try to split the precinct along a major road as opposed to a neighborhood street. This was done for several reasons. First, having precinct lines correspond with major natural or man-made boundaries made it easier for election officials who are responsible for maintaining an accurate list of voters. *Id.* at 805. Second, it is easier for voters to determine what district they are in when easily recognizable boundaries are used. *Id.* Finally, she testified to a concern regarding ballot secrecy. *Id.* at 805–06. The secrecy issue relates to the fact that precincts are split for a variety of different districts, including congressional districts, Senate

districts, House districts, school board districts, county commission districts, etc. Ms. Meggers expressed a concern about creating ballot combinations belonging to such a small number of people that one could determine a voter's identity simply by knowing the different districts within which that person voted. *Id.*

Ms. Meggers explained in detail what she would have had to do to reduce each district to a population deviation of plus or minus one person. For example, she testified that District 2, which is located in southwest Georgia, had only three split precincts, all in the Columbus area of Muscogee County. It had a population deviation of plus eight people. In order to reduce the deviation to zero, she would need to find a census block in one of those three precincts that bordered neighboring District 11 and that had exactly eight people. While one such voting block existed, as depicted in Defendant's Exhibit 6E, it would have required deviating from the major boundary, Edgewood Road, that was used to divide the precinct. However, even if she made such a change, that would have resulted in a change in the deviation in the adjoining District 11. Ms. Meggers explained that the only way to correct the deviation in District 11 was to deviate from a major boundary in an already split precinct; and even if that were done, it would cause a deviation that would need to be corrected in District 8. Ms. Meggers continued with the explanations, demonstrating how each deviation correction in each district could be accomplished only by departing from a major boundary and even then would serve only to create a deviation fluctuation in an adjoining district.

## II. Conclusions of Law

■ The Constitution of the United States requires that congressional and state legislative seats be apportioned equally, so as to ensure that the constitutionally guaranteed right of suffrage is not denied by debasement or dilution of the weight of a citizen's vote. *Reynolds v. Sims,* 377 U.S. 533, 555, 568, 84 S.Ct. 1362, 1378, 1385, 12 L.Ed.2d 506 (1964); *Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964). As the Supreme Court expressed more than forty years ago in a challenge to one of Georgia's previous state legislative reapportionment schemes:

> Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions.

*Gray v. Sanders,* 372 U.S. 368, 379–80, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963).

■ While the Court has allowed some flexibility in state legislative reapportionment and, to a lesser extent, in congressional reapportionment, the central and invariable objective in both instances remains "equal representation for equal numbers of people." *Wesberry,* 376 U.S. at 18, 84 S.Ct. at 535; *see also Reynolds,* 377 U.S. at 579, 84 S.Ct. at 1390. Thus, deviations from exact population equality may be allowed in some instances in order to further legitimate state interests such as making districts compact and contiguous, respecting political subdivisions, maintaining the cores of prior districts, and avoiding incumbent pairings. *See Karcher v.*

*Daggett,* 462 U.S. 725, 740–41, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983) (holding that State failed to meet its burden of proving deviations were necessary to achieve legitimate, nondiscriminatory legislative policy); *Reynolds,* 377 U.S. at 578–79, 84 S.Ct. at 1390–91. However, where population deviations are not supported by such legitimate interests but, rather, are tainted by arbitrariness or discrimination, they cannot withstand constitutional scrutiny. *See Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964).

The population deviations in the Georgia House and Senate Plans are not the result of an effort to further any legitimate, consistently applied state policy. Rather, we have found that the deviations were systematically and intentionally created (1) to allow rural southern Georgia and inner-city Atlanta to maintain their legislative influence even as their rate of population growth lags behind that of the rest of the state; and (2) to protect Democratic incumbents. Neither of these explanations withstands Equal Protection scrutiny. First, forty years of Supreme Court jurisprudence have established that the creation of deviations for the purpose of allowing the people of certain geographic regions of a state to hold legislative power to a degree disproportionate to their population is plainly unconstitutional. Moreover, the protection of incumbents is a permissible cause of population deviations *only* when it is limited to the avoidance of contests between incumbents and is applied in a consistent and nondiscriminatory manner. The incumbency protection in the Georgia state legislative plans meets neither criterion. Therefore, that interest cannot save the plans from constitutional infirmity. Quite simply, the Georgia plans violate the Equal Protection Clause. "Full and effective participation by all citizens in state government requires ... that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less." *Reynolds,* 377 U.S. at 565, 84 S.Ct. at 1383.

By contrast, we are satisfied that Georgia's congressional redistricting plan passes constitutional muster, as its minimal seventy-two person deviation appears to us to have been caused by legitimate efforts to limit the number of precinct splits and to contain any necessary precinct splits to easily recognizable boundaries.

We are in no way unmindful that in striking down two redistricting plans, we are necessarily interfering with the legislative process of reapportionment. The Supreme Court has recognized that the goal of fair and effective representation is not furthered "by making the standards of reapportionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts." *Gaffney v. Cummings,* 412 U.S. 735, 749, 93 S.Ct. 2321, 2329, 37 L.Ed.2d 298 (1973); *see also Miller v. Johnson,* 515 U.S. 900, 915, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" (quoting *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975))). However, where a state's reapportionment intrudes upon the fundamental right to vote for what can be characterized only as discriminatory and arbitrary reasons, it is our duty to step in. As the *Reynolds* Court advised:

We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rational-

ly consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.... "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." 377 U.S. at 566, 84 S.Ct. at 1384 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960)). This court will not ignore that duty.

## A. The Plaintiffs' One Person, One Vote Challenge to the State Legislative Plans

### 1. General Principles

The Supreme Court has long held that a claim asserted under the Equal Protection Clause of the Fourteenth Amendment, challenging the constitutionality of a state legislative apportionment scheme on the ground that a citizen's right to vote has been impaired through vote dilution, presents a justiciable controversy. *See, e.g., Reynolds*, 377 U.S. at 556, 84 S.Ct. at 1378; *Baker v. Carr*, 369 U.S. 186, 207–08, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962). Each state is, therefore, required to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds*, 377 U.S. at 577, 84 S.Ct. at 1390. This Equal Protection guarantee, commonly known as the one person, one vote principle, commands that "the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds*, 377 U.S. at 568, 84 S.Ct. at 1385.

However, the Supreme Court has recognized both that mathematical precision is not a workable constitutional requirement and that it is practically impossible to construct state legislative districts so that each one has an identical number of citizens. *See id.* at 577, 84 S.Ct. at 1390. Thus, the Court has allowed the states to exercise "[s]omewhat more flexibility" in state legislative redistricting than in congressional redistricting. *Id.* at 577–78, 84 S.Ct. at 1390. The Supreme Court has directed:

So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature.

*Id.* at 579, 84 S.Ct. at 1391. These deviations from perfect equality "may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. at 710, 84 S.Ct. at 1458.

In reviewing one person, one vote challenges to state legislative plans, the Supreme Court has adopted a so-called "ten percent rule" for allocating the burden of proof. In *Gaffney*, the Supreme Court observed that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." 412 U.S. at 745, 93 S.Ct. at 2327. After a series of cases further distinguishing minor population deviations from larger deviations requiring justification, *see, e.g., Con-*

nor v. Finch, 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977); White v. Regester, 412 U.S. 755, 764, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973), the Court eventually stated in more precise terms that, as a general matter, "an apportionment plan with a maximum population deviation *under 10%* falls within this category of minor deviations" that are insufficient to make out a prima facie case of discrimination in violation of the Fourteenth Amendment. *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983) (emphasis added). In contrast, a plan with a higher maximum deviation "creates a prima facie case of discrimination and therefore must be justified by the State." *Id.* at 842–43, 103 S.Ct. at 2696. In considering legitimate justifications, courts must consider "[t]he consistency of application and the neutrality of effect of the nonpopulation criteria" in order to determine whether a state legislative reapportionment plan violates the Fourteenth Amendment. *Id.* at 845–46, 103 S.Ct. at 2697–98.

Most lower courts presented with challenges to plans with population deviations of less than 10% have concluded that such plans are not automatically immune from constitutional attack. Thus, for example, the Fourth Circuit has held that the 10% threshold "does not completely insulate a state's districting plan from attack of any type" but, rather, "serves as the determining point for allocating the burden of proof in a one person, one vote case." *Daly v. Hunt,* 93 F.3d 1212, 1220 (4th Cir.1996). That court summarized the rule in these terms:

[I]f the maximum [population] deviation is less than 10%, the population disparity is considered de minimis and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness. To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a "taint of arbitrariness or discrimination." *Roman v. Sincock,* 377 U.S. at 710, 84 S.Ct. at 1458. In other words, for deviations below 10%, the state is entitled to a presumption that the apportionment plan was the result of an "honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. at 577, 84 S.Ct. at 1390. However, this is a rebuttable presumption.

*Id.; see also Cecere v. County of Nassau,* 274 F.Supp.2d 308, 311–12 (E.D.N.Y.2003) (holding that deviations under 10% create a rebuttable presumption of constitutionality); *Montiel v. Davis,* 215 F Supp.2d 1279, 1285–86 (S.D.Ala.2002) (three-judge court) (same); *Hulme v. Madison County,* 188 F.Supp.2d 1041, 1047 (S.D.Ill.2001) (same); *Abate v. Rockland County Legislature,* 964 F.Supp. 817, 819 (S.D.N.Y. 1997) (same); *Marylanders for Fair Representation v. Schaefer,* 849 F.Supp. 1022, 1032 (D.Md.1994) (three-judge court) (same).[12]

■ We agree that state legislative plans with population deviations of less than 10% may be challenged based on alleged violation of the one person, one vote principle. Indeed, the very fact that the Supreme Court has described the ten

12. *But see Wright v. City of Albany,* No. 1:03–CV–148, slip op. at 5 n.5, 11 (M.D.Ga. Dec. 24, 2003) (stating that a safe harbor exists for plans with population deviations of less than 10%); *Colleton County Council v. McConnell,* 201 F.Supp.2d 618, 631 (D.S.C.2002) (three-judge court) (same); *Fund for Accurate and Informed Representation, Inc. v. Weprin,* 796 F.Supp. 662, 668 (N.D.N.Y.1992) (three-judge court) (holding that plaintiffs cannot establish a prima facie case of discrimination if a plan has a maximum population deviation of less than 10%).

percent rule in terms of "prima facie constitutional validity" unmistakably indicates that 10% is not a safe harbor. *See Connor,* 431 U.S. at 418, 97 S.Ct. at 1835. Had the Court intended to foreclose all one person, one vote challenges to plans with population deviations not rising to the 10% level, the Court would undoubtedly have said as much, rather than expressing that such plans are merely "prima facie"— in other words, rebuttably—constitutional. And in this case, because the population deviations in both the House Plan and the 2002 Senate Plan are 9.98%, the ten percent rule applies (albeit barely). In short, the legislative plans are presumptively constitutional, and the burden lies on the plaintiffs to rebut that presumption.

The Supreme Court explained in *Roman* that "the proper judicial approach" to a one person, one vote claim is "to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from the taint of arbitrariness or discrimination." 377 U.S. at 710, 84 S.Ct. at 1458 (involving major deviations). The Supreme Court reiterated this sentiment in *Brown,* indicating that the "ultimate inquiry" is "whether the legislature's plan may reasonably be said to advance [a] rational state policy and, if so, whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits." 462 U.S. at 843, 103 S.Ct. at 2696 (citations and quotation marks omitted) (alteration in original) (involving major deviations).

In the redistricting of the Georgia state House and Senate, the drafters of the new electoral maps made no effort to make the districts as nearly of equal population as was practicable. In fact, it is quite appar-ent on this record that legislators and plan drafters made a concerted effort to contain population deviations to ± 5%, and no further, as they operated on the belief that there was a safe harbor of ± 5%. *See* Test. of Rep. Westmoreland, Tr. at 369–70, 409; Test. of Sen. Johnson, Tr. at 441; Test. of Sen. Brown, Tr. at 665–66; Test. of Linda Meggers, Tr. at 856–57. It is also apparent that any efforts to minimize population deviations ceased once the ± 5% level was reached, even though perfect equality was certainly attainable given current technology. *See* Test. of Sen. Brown, Tr. at 624, 651; Test. of Linda Meggers, Tr. at 730, 738, 740.

Such use of a 10% population window as a safe harbor may well violate the fundamental one person, one vote command of *Reynolds,* requiring that states "make an honest and good faith effort to construct districts ... as nearly of equal population as practicable" and deviate from this principle only where "divergences ... are based on legitimate considerations incident to the effectuation of a rational state policy." 377 U.S. at 577, 579, 84 S.Ct. at 1390, 1391. The use of a 10% safe harbor may also conflict with the *Roman* Court's observation that "the constitutionally permissible bounds of discretion in deviating from apportionment according to population" cannot be stated in a uniform mathematical formula, as it assumes that 10% is such a mathematical formula. 377 U.S. at 710, 84 S.Ct. at 1458.

We need not decide, however, whether the mere use of a 10% population window renders Georgia's state legislative plans unconstitutional, because the policies the population window was used to promote in this case were not "free from any taint of arbitrariness or discrimination." *Roman,* 377 U.S. at 710, 84 S.Ct. at 1458. The record makes abundantly clear that the population deviations in the Georgia House

and Senate were not driven by any traditional redistricting criteria such as compactness, contiguity, and preserving county lines. Instead, the defense has put forth two basic explanations for the population deviations. First, witnesses for the defendant have repeatedly asserted—and a look at the redistricting maps does nothing to dispel the notion—that a powerful cause of the deviations in both plans was the concerted effort to allow rural and inner-city Atlanta regions of the state to hold on to their legislative influence (at the expense of suburban Atlanta), even as the rate of population growth in those areas was substantially lower than that of other parts of the state. Second, the deviations were created to protect incumbents in a wholly inconsistent and discriminatory way. On this record, neither explanation can convert a baldly unconstitutional scheme into a lawful one.

## 2. Regionalism

As we have found, regionalism—namely, a desire by rural and inner-city Atlanta legislators to retain their legislative influence even as the population of these areas has languished in comparison to the high-growth areas of north Georgia—was a major cause of the population deviations in the Georgia House and Senate Plans. Linda Meggers, the principal drafter of the House Plan, unambiguously said that an effort to allow rural south Georgia to keep as many seats as possible was a basic cause of the population deviations in the House. Meggers testified, "We knew that at a minimum [rural Georgia was] going to lose seven seats, and my job was to keep from doing that." Test. of Linda Meggers, Tr. at 729; *see also id.* at 730 (describing how she intentionally took all of southern Georgia, "lassoed it in as if it were one big district," and created a series of districts with negative population deviations in the region); *id.* at 739 ("[T]hey didn't want to lose any more representation out of rural

south Georgia than they had to"); *id.* at 743 ("[The negative deviations] are in south Georgia because those folks wanted to minimize their loss of power."). Senator Brown said the same thing with respect to the population deviations in the Senate. Test. of Sen. Brown, Tr. at 619 ("[W]hen I looked at the southern part of the state, there was one paramount concern, and that was that we not lose any more districts than would absolutely be necessary."); *id.* at 652 ("[Y]ou had the desire on the part of the rural senators to have as many rural senators as possible.").

A look at the actual plans also makes it abundantly clear that regional favoritism substantially drove the population deviations, as districts in rural southern Georgia and inner-city Atlanta tended to be substantially underpopulated, while those in other parts of the state were correspondingly overpopulated. In the Senate, every single district that was underpopulated by at least 4% was located either in rural Georgia south of I–20 or in inner-city Atlanta. The correspondingly overpopulated districts were in the more suburban parts of the state. Bensen Report at Senate 2002 App. Tab 7. The vast majority of the House districts fit the same pattern, with underpopulated districts in the rural south and inner city and overpopulated ones in suburban areas. Bensen Report at House App. Tab 7.

The House and Senate Plans must be struck down on this basis alone, because the Supreme Court has long and repeatedly held that favoring certain geographic regions of a state over other regions is unconstitutional. Discrimination against certain voters based on the fortuity of where in the state they live cannot be reconciled with the command of *Reynolds:*

> The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his

vote.... [T]he basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives.... A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of "government of the people, by the people, [and] for the people." The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races.

377 U.S. at 567–68, 84 S.Ct. at 1384–85.

In that landmark one person, one vote case, the Supreme Court struck down a reapportionment plan in Alabama in which rural citizens were given vastly greater voting power than citizens in the state's more urban counties. *Id.* at 568–69, 84 S.Ct. at 1385. The Court ultimately found the plan to violate the basic Equal Protection principle that "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Id.* at 568, 84 S.Ct. at 1385. The Court included strong language concerning the policy of giving some citizens more or less of a vote in an attempt to further geographic interests:

> [A]ll voters, as citizens of a State, stand in the same relation regardless of where they live. Any suggested criteria for the differentiation of citizens are insufficient to justify any discrimination, as to the weight of their votes, unless relevant to the permissible purposes of legislative reapportionment.... Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just

as much as invidious discriminations based upon factors such as race or economic status.

377 U.S. at 565–66, 84 S.Ct. at 1383–84 (citations omitted).

The *Reynolds* Court thus articulated this basic principle of constitutional jurisprudence: states cannot seek to protect certain geographic interests by allotting them more seats in the state legislature, and thus more legislative influence, than their population would otherwise allow. As the Court said, "Our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures." *Id.* at 566, 84 S.Ct. at 1384. Thus, regional interests must be promoted by other means—means that do not dilute or otherwise impair the vote of individuals living in particular regions of the state.

The Court also noted:

> Although legislative apportionment controversies are generally viewed as involving urban-rural conflicts, much evidence indicates that presently it is the fast-growing suburban areas which are probably the most seriously underrepresented in many of our state legislatures.... Malapportionment can, and has historically, run in various directions. However and whenever it does, it is unconstitutionally impermissible under the Equal Protection Clause.

*Id.* at 567 n. 43, 84 S.Ct. at 1384 n. 43. Quite simply, the dilution of votes based on mere acreage or even upon larger regional interests is both arbitrary and discriminatory.

The *Reynolds* court clearly expressed that, while some deviations from the equal-population principle are permitted in state legislative reapportionment when they are based on "legitimate considerations incident to the effectuation of a rational state policy," *id.* at 579, 84 S.Ct. at 1391, geo-

graphic interests do *not* fall within this category of legitimate considerations, *id.* at 579–80, 84 S.Ct. at 1391.

The defendant argues, nonetheless, that the population deviations in this case are permissible because the one person, one vote principle has been relaxed since *Reynolds*, particularly in those cases that have expressed and applied the ten percent rule. We disagree. While the Supreme Court and the lower courts have allowed the states some flexibility in the pursuit of legitimate state interests, the Court has never retreated from the firm command in *Reynolds* that "[d]iluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status." *Id.* at 566, 84 S.Ct. at 1384 (citations omitted). Thus, for example, in *Hadley v. Junior College Dist. of Metropolitan Kansas City*, the Court struck down a voting scheme for the trustees of a junior college district, using the same general one person, one vote standards that apply in congressional and state legislative reapportionment, because that scheme resulted in "a systematic discrimination against voters in the more populous school districts." 397 U.S. 50, 57, 90 S.Ct. 791, 795–96, 25 L.Ed.2d 45 (1970). And, in *Abate v. Mundt*, the Court upheld a plan for a county board of supervisors that had a total population deviation of 11.9% because the deviation was supported by the state's long history of having the same individuals hold the governing positions in a county and its towns and because there was no indication that the plan "was designed to favor particular groups." 403 U.S. at 186, 91 S.Ct. at 1907.

In explaining its decision, the *Abate* Court reiterated the lessons of *Reynolds* and *Hadley*:

[T]his Court has never suggested that certain geographic areas or political interests are entitled to disproportionate representation. Rather, our statements have reflected the view that the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality. Accordingly, we have underscored the danger of apportionment structures that contain a built-in bias tending to favor particular geographic areas or political interests . . . .

*Id.* at 185–86, 91 S.Ct. at 1907. *See also Brown*, 462 U.S. at 844, 103 S.Ct. at 2697 (upholding a state legislative reapportionment scheme in Wyoming because its 89% maximum population deviation was caused by consistent and nondiscriminatory application of the state's long-held policy of using counties as representative districts and because there was "no indication that the larger cities or towns [were] being discriminated against" and "no preference for the cattle-raising or agricultural areas as such") (citations and quotation marks omitted); *Wells v. Rockefeller*, 394 U.S. 542, 546, 89 S.Ct. 1234, 1237, 22 L.Ed.2d 535 (1969) (striking down a congressional reapportionment plan that divided the State of New York into seven regions of differing population and then further divided each of those regions into districts of equal population, thereby yielding a maximum statewide population deviation of 13.10%, and commenting that "[t]o accept a scheme such as New York's would permit groups of districts with defined interest orientations to be overrepresented at the expense of districts with different interest orientations"); *Marshall v. Hare*, 378 U.S. 561, 84 S.Ct. 1912, 12 L.Ed.2d 1036 (1964) (reversing and remanding a case in which a three-judge district court had found that the assurance of adequate representation to a sparsely populated and impoverished region justified population

deviations exceeding a ratio of 2 to 1); *Davis v. Mann*, 377 U.S. 678, 692, 84 S.Ct. 1441, 1448, 12 L.Ed.2d 609 (1964) (rejecting the argument that a plan with a maximum population-variance ratio of 2.65 to 1 was "sustainable as involving an attempt to balance urban and rural power in the legislature"); *WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 653–54, 84 S.Ct. 1418, 1428–29, 12 L.Ed.2d 568 (1964) (stating that "[h]owever complicated or sophisticated an apportionment scheme might be, it cannot, consistent with the Equal Protection Clause, result in a significant undervaluation of the weight of the votes of certain of a State's citizens merely because of where they happen to reside" and, thereby, rejecting a plan that had an average population-variance ratio of 1.5 to 1 between less-populated and more-populated counties, which the Court found to signify "a built-in bias against voters living in the State's more populous counties").

Moreover, the lower federal courts considering this issue have generally agreed that voting schemes may not create population deviations to favor the interests of one region at the expense of another. *See, e.g., Hulme*, 188 F.Supp.2d at 1051–52 (striking down reapportionment scheme with maximum population deviation of 9.3% because, inter alia, legislative committee chairman "clearly pursued, and ultimately accomplished, his intent to maintain four districts for Alton Township, even though population shifts did not justify it"); *Roxbury Taxpayers Alliance v. Delaware County Bd. of Supervisors*, 886 F.Supp. 242, 254 (N.D.N.Y.1995) (upholding plan for the election of county board of supervisors in which each town representative cast weighted number of votes that was directly proportional to his or her town's portion of the county's total population, in part because there was no suggestion that plan "contain[ed] any built-in bias favoring a particular political interest, race or geographic area"); *Marylanders*, 849 F.Supp. at 1035 (holding that plaintiffs failed to establish that population deviations were caused by desire to maximize legislative representation of the City of Baltimore and stating in dicta that regional considerations in drawing of district lines were likely permissible so long as they did not result in substantial vote dilution).

Rural and inner-city Atlanta voters in Georgia make up a smaller proportion of the population now than they did in the past, primarily because the suburban communities surrounding Atlanta have been growing at a faster rate. Manipulating the legislative districting map to allow rural Georgia and inner-city Atlanta to maintain the number of seats those areas used to have is tantamount to saying that the interests of rural and inner-city voters are simply more important than those of other citizens. Democratic governments are designed for the benefit of the people who live in the state now, not for the benefit of the people who lived there thirty or forty years ago. There are many ways to ensure that the views and desires of the citizens of rural Georgia are heard, but giving them more legislative influence than their population fairly warrants is a kind of electoral dead-hand control: it allows a minority to maintain political power more commensurate with the numbers it used to have than with the numbers it has today.

The defendant argues, nevertheless, that because the Supreme Court has recognized redistricting along county lines as a justification for population deviations, *see, e.g., Brown*, 462 U.S. at 844, 103 S.Ct. at 2696–97; *Mahan*, 410 U.S. at 329, 93 S.Ct. at 987, we must also recognize redistricting to serve regional ends as a similar justification, because regional interests are more pronounced in this modern age than are county interests. This argument misses the point of permitting deviations in order

to "maintain[] the integrity of political subdivision lines." *Mahan,* 410 U.S. at 329, 93 S.Ct. at 987. An interest in preserving discrete local political boundaries was deemed rational precisely because it recognized both the function that smaller governmental units (such as counties) serve in state politics and the long-standing tradition of some states to divide political power equally among their various subdivisions. *See Reynolds,* 377 U.S. at 580–81, 84 S.Ct. at 1391–92; *see also Brown,* 462 U.S. at 843–44, 103 S.Ct. at 2696–97; *Mahan,* 410 U.S. at 325–26, 93 S.Ct. at 985. In *Reynolds,* the Court explained:

> A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering.

377 U.S. at 580–81, 84 S.Ct. at 1391. This logic cannot be applied to whole regions of the state (such as all districts beneath I–20, the fall line in Georgia), which do not represent separate political entities. The governmental units of cities and counties contain the election offices responsible for such important governmental functions as the development of voter registration lists,

the preparation of ballots, and the holding of elections. Thus, following those boundaries in the drawing of district lines provides the additional benefit of creating less confusion and fewer mistakes on election day.

Moreover, when district boundaries are drawn along a county or precinct line, the purpose of such line-drawing is not actually to enhance the legislative power of residents of the county or to make up for lost population but, rather, simply to avoid voter confusion and to unify residents of the same county by giving them all the same elected representation. By contrast, a concerted effort to enhance the rural power of the whole state by systematically underpopulating rural districts and overpopulating urban or suburban ones is not concerned with unifying the interests of rural voters—indeed, in this instance, many district lines are drawn within the rural areas, separating the voters in these areas from one another. Rather, the goal of rural district underpopulation is plainly to overweight the votes of the region's residents and thereby increase the power of rural voters at the demonstrable expense of voters in other parts of the state—an objective that the Supreme Court quite sensibly has held to violate the Constitution.

Indeed, in those cases in which the Supreme Court has approved a state's apportionment of state legislative seats along *county* or *city* lines, the Court expressly observed that the plans, while offering some counties or cities more representation than others, did not contain any "built-in bias tending to favor particular political interests or geographic areas." *Abate,* 403 U.S. at 187, 91 S.Ct. at 1907–08; *see also Brown,* 462 U.S. at 844, 103 S.Ct. at 2697 (quoting *Abate,* 403 U.S. at 187, 91 S.Ct. at 1907–08). The plans at issue in this case do just that; and it is that dis-

criminatory bias which makes them unconstitutional.

Simply stated, a state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause. A state cannot dilute or debase the vote of certain citizens based merely on the fortuity of where in the state they reside any more than it can dilute citizens' votes based upon their race, gender, or economic status. While states may employ minor population deviations in redistricting in order to pursue legitimate state interests, such as drawing compact and contiguous districts or preserving the boundaries of the state's political subdivisions, enhancing the political power of large swaths of geography is not such an interest. Thus, in this instance, if the southern and inner-city Atlanta areas of the State of Georgia are in need of some political protection in order to ensure that their economic and other interests are recognized on a statewide basis, that need must be met in some way that does not dilute or debase the fundamental right to vote of citizens living in other parts of the state. In short, the deliberate regional favoritism built into the Georgia House and Senate Plans created more than a taint of arbitrariness and discrimination, violating Equal Protection by diluting the votes of citizens of the suburban and exurban parts of northern Georgia and overweighting the votes of citizens in rural Georgia and inner-city Atlanta.

### 3. Incumbency Protection

█ On this record, the creation of population deviations to protect incumbents in the Georgia House and Senate also does not qualify as a legitimate state policy. The incumbency protection in the plans was not consistently applied and went far beyond anything the Supreme Court has ever allowed. Although the plans' drafters were concerned about incumbent protection, insofar as they sought to create "safe districts" for those Democratic incumbents who supported the plans, they plainly did not apply this interest in a manner that is even remotely consistent with the principles set forth in *Reynolds, Karcher,* and their progeny.

First, the policy of protecting incumbents was not applied in a consistent and neutral way. *See Brown,* 462 U.S. at 845–46, 103 S.Ct. at 2697–98. On the contrary, it was applied in a blatantly partisan and discriminatory manner, taking pains to protect only Democratic incumbents. The vast majority of districts with negative population deviations were held by Democratic incumbents, while the majority of overpopulated districts were held by Republican incumbents. Moreover, both the House and Senate Plans actually pitted numerous Republican incumbents against one another, while generally protecting their Democratic colleagues.

Far from consistently protecting incumbents, the plans destroyed the reelection hopes of dozens of incumbents. The House Plan created contests between a total of forty-seven incumbents, almost all Republicans. Because six of the affected twenty-one districts were multi-member districts, the end result was that a maximum of twenty-eight of the paired incumbents could be re-elected, while at least nineteen incumbents would be unseated. Likewise, the Senate Plan had six incumbent contests, all involving Republican incumbents facing either other Republican incumbents or, in two instances, Democratic incumbents. These results occurred despite the fact that Republican-leaning areas of the state had a higher rate of population growth, which would suggest that Democrat–Democrat pairings should have

been more common than Republican–Republican pairings.

Moreover, many of the districts that created contests between Republican incumbents were not only oddly shaped but also vastly overpopulated. Almost all of these districts bordered at least one underpopulated district, meaning that the deviations could have been avoided if the drafters had simply transferred some of the population from those districts into neighboring districts. Senate District 17, to take one example, had a population deviation of + 4.97%, and yet it bordered District 10, which was at –4.96%, and District 43, which was at –4.79%. House District 85, with a deviation of + 4.30%, bordered District 59, which was at –4.24%, District 60, at –4.66%, and District 92, at – 4.60%. This was the very embodiment of a state policy applied in a discriminatory and arbitrary manner. *See Vieth v. Pennsylvania*, 195 F.Supp.2d 672, 678 (M.D.Pa. 2002) (three-judge court) (rejecting the state's argument that population deviations in a congressional reapportionment plan were justified by a concern for core retention because "[t]o the extent that [the plan] retains the cores of prior districts, it does so only for districts containing Republican incumbents").

A second reason why the protection of incumbents cannot justify the deviations in the state legislative plans is that the protection was overexpansive. The Supreme Court has said only that an interest in avoiding contests between incumbents may justify deviations from exact population equality, not that general protection of incumbents may also justify deviations. *See,*

*e.g., Bush v. Vera*, 517 U.S. 952, 964, 116 S.Ct. 1941, 1954, 135 L.Ed.2d 248 (1996) (recognizing "incumbency protection, at least in the limited form of avoiding contests between incumbents," as a legitimate state interest in defending against a racial gerrymandering claim (citations and quotation marks omitted)); *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663 (including "avoiding contests between incumbent Representatives" in a non-inclusive list of legislative policies that might justify minor population deviations in congressional reapportionment plans); *Burns v. Richardson*, 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966) (stating as a general matter, without respect to population deviations, "[t]he fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness").[13]

In general, the lower courts have similarly listed *only* the prevention of contests between incumbents, rather than some broader notion of incumbency protection, as a legitimate state goal supporting population deviations. *See, e.g., Marylanders,* 849 F.Supp. at 1036 (listing "avoiding contests between incumbent representatives" as one of several legitimate state policies that supported the minor population deviations at issue); *Gonzalez v. Monterey County*, 808 F.Supp. 727, 735 (N.D.Cal. 1992) (noting that "[t]he Supreme Court regards state policies favoring the avoidance of contests between incumbent legislators as a legitimate justification for minor population deviations, provided the state does not have a discriminatory pur-

---

**13.** The more general interest of protection of incumbents has, in fact, been criticized by Justices Breyer and Ginsburg in the campaign-contribution context: "Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments-at least where

that deference does not risk *such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge." Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 402, 120 S.Ct. 897, 912, 145 L.Ed.2d 886 (2000) (Breyer, J., concurring) (emphasis added).

pose in preserving incumbency"); *Wesch v. Hunt,* 785 F.Supp. 1491, 1499 (S.D.Ala. 1992) (three-judge court) (modifying Alabama's congressional redistricting plan so that two incumbent congressmen would not be in the same district), *aff'd without opinion, Camp v. Wesch,* 504 U.S. 902, 112 S.Ct. 1926, 118 L.Ed.2d 535 (1992). *But see Anne Arundel County Republican Cent. Comm. v. State Admin. Bd. of Election Laws,* 781 F.Supp. 394, 398 (D.Md. 1991) (three-judge court) (upholding a congressional redistricting plan in which the state justified population deviations by showing that the plan drafters aimed to give an incumbent congressman a safe seat and, at the same time, provide a majority black population in that area a chance to choose a representative without requiring someone to run against a strong incumbent).

In this case, it is clear that many of the incumbent-protecting population deviations were caused not by the legitimate state interest in avoiding contests between incumbents, but, rather by the more aggressive goal of allowing incumbents to avoid taking on more new constituents than was absolutely necessary to stay within 5% of the ideal district size. The defendant has not attempted to present any evidence that any of the population deviations were truly necessary to avoid pairing two incumbents. In short, in this case, the interest of incumbent protection was not applied in a reasonably consistent and nondiscriminatory way and cannot be used to justify the population deviations.

### 4. Traditional Redistricting Principles

Moreover, there is no evidence that the population deviations in the plans were driven by the neutral and consistent application of any traditional redistricting principles.

The *Reynolds* Court held that states may deviate from population equality in state legislative reapportionment plans for the purpose of constructing districts that are compact and contiguous or that respect the boundaries of the state's various political subdivisions. 377 U.S. at 578–79, 84 S.Ct. at 1390. Moreover, in the congressional one person, one vote context, the Supreme Court has said that certain legislative policies, such as making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbents, may justify population deviations, so long as these policies are nondiscriminatory and consistently applied. *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663.[14] Finally, in *Abrams,* the Supreme Court noted that considerations which were unique to Georgia and which supported the population deviations in the state's former congressional reapportionment plan included a "strong historical preference" for not splitting counties outside the Atlanta area and not splitting precincts, maintenance of core districts, and recognition of communities of interest (which in that case were defined as the state's "unusually high number of counties"). 521 U.S. at 99–100, 117 S.Ct. at 1940.

The plaintiffs argue that none of these considerations can account for the 9.98% population deviations in either the House Plan or the 2002 Senate Plan, and the defendant does not contradict this assertion. Indeed, the defendant has not attempted to justify the population deviations because of compactness, contiguity,

---

14. *Karcher* further suggested that an interest in "preserving the voting strength of racial minority groups" might also justify deviations from the equal population principle. 462 U.S. at 742, 103 S.Ct. at 2664. However, there is no indication that such an interest explains the population deviations in this case.

respecting the boundaries of political subdivisions, or preserving the cores of prior districts. And the record evidence squarely forecloses the idea that *any* of these legitimate reasons could account for the deviations.

First, in considering the interest in *compactness,* there is not even the slightest suggestion that the population deviations in the House Plan or the 2002 Senate Plan resulted from an attempt to create compact districts. As we have already noted, one can easily discern that just by looking at the maps themselves—in particular at districts such as House Districts 13, 47, 87, 127, and 137, and Senate Districts 16, 17, 24, 28, and 51. Moreover, as we have noted, a more sophisticated analysis of district compactness, calculated by the perimeter-to-area measure or the smallest circle measure, also establishes that compactness was not a factor here. Indeed, quite a few of the districts have shapes that defy Euclidean geometry. The drafters of the House and Senate Plans made no effort to keep districts compact and certainly did not create deviations for the purpose of improving compactness. Linda Meggers and Senator Brown acknowledged that compactness was not a priority in the redistricting process. Finally, we observe that many of the most bizarrely shaped districts are also the ones with the *largest* population deviations. Clearly, the population deviations in the House and Senate Plans were not caused by a desire to keep districts compact.

Likewise, there is no indication in this record that a regard for *contiguity* caused the population deviations in the plans. Numerous districts in the House and Senate were kept contiguous only by having them cross bodies of water or by having touch point contiguity. Many of these marginally contiguous districts also had significant population deviations. Notably, the defendant has not attempted to justify the deviations on this basis either. Accordingly, we conclude that the population deviations in the House Plan and the 2002 Senate Plan did not result from an interest in contiguity.

Nor are the population deviations in the plans the result of any attempt to respect the boundaries of the state's various *political subdivisions.* The Supreme Court noted just seven years ago that Georgia had a "strong historical preference" for not splitting counties outside the Atlanta area. *Abrams,* 521 U.S. at 99, 117 S.Ct. at 1940. Moreover, county delegations hold significant sway over local legislation. Gaddie Report at 17. Nonetheless, both Ms. Meggers and Senator Brown testified that avoiding county splits was not an important factor in the creation of the plans. We add that the defendant has not urged this as a ground to explain the deviations either. And nothing in the testimonial or circumstantial record indicates that the population deviations in the plans were driven by an effort to keep counties (or other political entities) together. The House Plan split 80 of the state's 159 counties, and the 2002 Senate Plan split 81. Both numbers were significantly higher than they had been in the previous redistricting. Therefore, we readily conclude that population deviations in the House Plan and the 2002 Senate Plan did not result from an interest in respecting the boundaries of the state's various political subdivisions.

The population deviations in the state legislative plans were also not motivated by a desire to *preserve the cores* of all prior districts. To the extent that the cores of prior districts were preserved at all, it was done in a thoroughly disparate and partisan manner, heavily favoring Democratic incumbents while creating new districts for Republican incumbents whose constituency was composed of only a small

fraction of their old voters. This was the exact opposite of what one would expect from the rates of population increase in the state, because the populations in Republican-leaning areas have grown at a significantly faster pace than those of Democratic-leaning districts, meaning that Republicans would, in a neutral plan, have to take on fewer new constituents. Moreover, this was not among the factors specifically mentioned in the guidelines for redistricting adopted by the House and Senate reapportionment committees, and it was not offered by the defendant as a justification for the population deviations. Quite simply, the population deviations in the House Plan and the 2002 Senate Plan did not result from a neutral, consistently applied concern for retaining incumbent cores. *See also Vieth*, 195 F.Supp.2d at 678 (rejecting the state's argument that population deviations in a congressional reapportionment plan were justified by a concern for core retention because "[t]o the extent that [the plan] retains the cores of prior districts, it does so only for districts containing Republican incumbents").

Finally, it is unnecessary in this case to decide whether partisan advantage alone would have been enough to justify minor population deviations, although the Supreme Court has never sanctioned partisan advantage as a legitimate justification for population deviations.[15] It is true that the Supreme Court has acknowledged the "reality ... that districting inevitably has and is intended to have substantial political consequences." *Gaffney*, 412 U.S. at 753, 93 S.Ct. at 2331. Moreover, the Supreme Court has recognized that "the goal of fair and effective representation [is not] furthered by making the standards of reap-

portionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts." *Id.* at 749, 93 S.Ct. at 2329 (recognizing that minor deviations are insufficient to make out *prima facie* claim). And it is clear that, according to the strict standard set by *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), the plaintiffs could not establish a claim of unconstitutional partisan *gerrymandering*. *Id.* at 127, 139, 106 S.Ct. at 2808, 2814 (requiring proof of "both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group," such that the plaintiffs have "essentially been shut out of the political process").

However, the Supreme Court's recognition of the politics inherent in districting arose in the context of political gerrymandering. *See Gaffney*, 412 U.S. at 751–52, 93 S.Ct. at 2330–31. Today, we have no occasion to consider the limits of partisan gerrymandering, but rather the very different set of considerations invoked by a claim that the one person, one vote principle has been violated. The value at issue today is an individualized and personal one, and therefore the offense to Equal Protection that occurred in this case is more readily apparent than in a claim involving gerrymandering. The Supreme Court has recognized the difference by placing greater restrictions on deviations from one person, one vote than on gerrymandering. "Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens liv-

---

**15.** Indeed, there is some suggestion that the Supreme Court would reject such political apportioning. *See Abate*, 403 U.S. at 187, 91 S.Ct. at 1908 ("We emphasize that our decision [to approve the plan at issue] is based [in part] on the fact that the plan before us does

*not* contain a built-in bias tending to favor particular *political* interests or geographic areas." (emphasis added), *quoted by Brown v. Thomson*, 462 U.S. 835, 843–44, 103 S.Ct. 2690, 2696–97, 77 L.Ed.2d 214 (1983)).

ing in other parts of the State." *Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1384. By sharp contrast, in *Bandemer,* the Court held that "the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." 478 U.S. at 131, 106 S.Ct. at 2810.

We need not resolve the issue of whether or when partisan advantage alone may justify deviations in population, because here the redistricting plans are plainly unlawful. In the state legislative plans at issue in this case, partisan interests are bound up inextricably with the interests of regionalism and incumbent protection. It is simply not possible to draw out and isolate the political goals in these plans from the plainly unlawful objective of regional protection or from the inconsistently applied objective of incumbent protection.

Ultimately, "[t]he showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Karcher,* 462 U.S. at 741, 103 S.Ct. at 2664. In no way do the Georgia plans make such a showing. First, while a 9.98% total deviation is not presumptively unconstitutional, the plans' drafters pushed the deviation as close to the 10% line as they thought they could get away with, conceding the absence of an "honest and good faith effort" to construct equal districts. *See Reynolds,*

377 U.S. at 577, 84 S.Ct. at 1390. The 9.98% total deviations are most assuredly not the result of only a small number of outliers; in fact, dozens of districts come close to the 5% line, and the average deviation is well above 3% in both the House and the Senate. Second, each population deviation requires at least *some* plausible and consistently applied state interest to justify it; yet not one of the legitimate state interests listed by the *Karcher* Court applies in this case, and the defendant's two proffered justifications are plainly impermissible. Third, the record shows not only that the creators of the plans had the technical capability to create maps with substantially smaller population deviations than the plans that were eventually passed but also that the legislators were actually presented with a number of proposed maps with smaller deviations and systematically rejected them. It is readily apparent that alternative plans could have been easily constructed that did not stretch the limits of the one person, one vote principle so far, all the while achieving the state's legitimate interests.

In short, the plaintiffs have shown that the state legislative reapportionment plans enacted by the Georgia Legislature do not represent an "effort to construct districts ... as nearly of equal population as is practicable." *Reynolds,* 377 U.S. at 577, 84 S.Ct. at 1390.[16] They have also shown that the 9.98% population deviations in those plans are not supported by *any* legitimate, consistently-applied state interests but, rather, resulted from the arbitrary and discriminatory objective of increasing the political power of southern

---

**16.** While state officials may have acted in good faith in relying on faulty legal advice, i.e., that 10% is a safe harbor for population deviations and that this ± 5% spread may be used for any purpose, a mistaken interpretation of the law does not remedy the constitutional infirmity in these plans. *See Raske v.*

*Martinez,* 876 F.2d 1496, 1502 (11th Cir.1989) ("The federal courts recognize no doctrine of 'constitutional mistake' that can absolve a legislature from the consequences of a misapprehension concerning a statute's constitutionality.").

Georgia and inner-city Atlanta at the expense of voters living in other parts of the state, and from the systematic favoring of Democratic incumbents and the corresponding attempts to eliminate as many Republican incumbents as possible. This represents far more than a "taint of arbitrariness or discrimination." *Roman v. Sincock,* 377 U.S. at 710, 84 S.Ct. at 1458.

We therefore conclude that the House Plan and the 2002 Senate Plan violate the Equal Protection Clause by failing to represent "an honest and good faith effort to construct districts ... as nearly of equal population as is practicable" and by failing to contain only those "divergences from a strict population standard [that] are based on legitimate considerations incident to the effectuation of a rational state policy." *Reynolds,* 377 U.S. at 577, 579, 84 S.Ct. at 1390, 1391.

## B. The Plaintiffs' One Person, One Vote Challenge to the Congressional Plan

■ The Constitution provides that congressional representatives "shall be apportioned among the several States which may be included within this Union, according to their respective Numbers." U.S. Const. art. I, § 2, cl. 3. Those representatives are to be chosen "by the People," *id.* at cl. 1, "mean[ing] that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry,* 376 U.S. at 7–8, 84 S.Ct. at 530. The Supreme Court was aware of the difficulty inherent in any system that requires such a minute level of detail; "[w]hile it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives." *Id.* at 18, 84 S.Ct. at 535. Recognizing that a zero deviation will not always be possible,

the Supreme Court has given the following instructions for evaluating a plan that varies from the ideal:

First, the court must consider whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population. Parties challenging apportionment legislation must bear the burden of proof on this issue, and if they fail to show that the differences could have been avoided the apportionment scheme must be upheld. If, however, the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality, the State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal.

*Karcher,* 462 U.S. at 730–31, 103 S.Ct. at 2658. Lest there be any doubt, the Supreme Court specifically stated that "there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2, without justification." *Id.* at 734, 103 S.Ct. at 2660.

Should the plaintiffs establish their initial burden of showing that the Congressional Plan was not a good faith effort to achieve a zero deviation, the defendant must then show that the plan is justified by a consistently applied legislative policy that is within constitutional norms. *Id.* at 740, 103 S.Ct. at 2663.

However, while legitimate state concerns may justify slight deviations, "[p]roblems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster." *Kirkpatrick v. Preisler,* 394 U.S. 526, 533, 89 S.Ct. 1225, 1230, 22 L.Ed.2d 519 (1969). In other words, the rule is one of *practicability,* rather than one of political *practicality. Id.* Likewise, variances based on history, economics, or group in-

terests will not justify deviations; "'[c]iti-zens, not history or economic interests, cast votes.'" *Id.* (quoting *Reynolds*, 377 U.S. at 580, 84 S.Ct. at 1391).

It is abundantly clear to us that the population deviations in this case could have been eliminated had the state engaged in a good faith effort to craft districts of equal population. As previously noted, the total population deviation for the final Congressional Plan was only seventy-two people. Ms. Meggers testified that it would be possible to draw a congressional map for the State of Georgia with a population deviation of plus or minus one person that (1) complied with the Voting Rights Act; (2) split fewer counties than the present plan; (3) is more compact than the present plan; and (4) divides fewer voting precincts than the present plan. Test. of Linda Meggers, Tr. at 881–83. The fact that such a plan could have been produced all but invalidates any argument that the state made a good faith effort to achieve a zero deviation. *See Karcher*, 462 U.S. at 736, 103 S.Ct. at 2662; *Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 644 (N.D.Ill.1991) (three-judge court). Accordingly, the plaintiffs have met their burden, and the defendant must now put forth a consistently applied legislative policy that justifies the deviation.

The defendant, through arguments articulated in her briefs and through testimony presented at trial, has consistently made the court aware of how political the process was, in essence arguing that this is the best plan that could be created that would actually have a chance of passing both houses of the General Assembly. Test. of Linda Meggers, Tr. at 786; Def.'s Br. in Supp. of her Mot. for Summ. J. [83–1] at 72–73. However, that argument, at least to the extent it is offered as an explanation for the population deviation, simply misses the mark. A legislature is not free to put forth an unconstitutional map, asserting that it did the best it could given the political constraints imposed by its members. *See Kirkpatrick*, 394 U.S. at 533, 89 S.Ct. at 1230.

■ While politics alone may not serve to justify deviations in a congressional plan, a redistricting process need not be free of politics in order to be constitutional. Politics and political considerations are, after all, "inseparable from districting and apportionment." *Gaffney*, 412 U.S. at 753, 93 S.Ct. at 2331. As long as the population deviations are supported by a legitimate state interest, the court will not strike down a plan simply because political considerations played a role in its creation. Accordingly, we proceed to consider the additional explanations put forth by the State of Georgia.

The state contends that it did not further reduce the population deviation because to do so would have required either splitting more precincts or further splitting existing split precincts along something other than an easily recognizable boundary. Georgia has a historical tradition of splitting as few precincts as possible. *Abrams*, 521 U.S. at 99, 117 S.Ct. at 1940 (citing *Johnson*, 922 F.Supp. at 1562). Additionally, the state has an interest in splitting precincts along only easily recognizable boundaries. When small residential roads are used as district lines, it is hard for both voters and election officials to accurately ascertain the voting district within which one resides. This problem is exacerbated when other voting districts, such as those used by the state legislature or local school officials, do not create districts along those same small roads. *See Johnson v. Miller*, 922 F.Supp. at 1562 n. 7 (explaining the ballot secrecy concerns that arise when small blocks are drawn out of a precinct). We are satisfied that the State of Georgia had a legitimate interest in avoiding further precinct splits and in

avoiding precinct splits along something other than an easily recognizable boundary.

The plaintiffs presented the testimony of Bryan Tyson, who was of the opinion that Ms. Meggers could have further reduced the population deviations in some of the congressional districts, even while avoiding precinct splits across something other than an easily recognized boundary. Test. of Bryan Tyson, Tr. at 948–49. His testimony, however, does nothing to discredit Ms. Meggers' statements. Mr. Tyson attempted to show the court that there was an alternate way of correcting the population deviation in District 2. He testified to a census block of thirty people that could have been "traded" for a neighboring block to correct the plus eight deviation in District 2. Although he did not so testify, Mr. Tyson was presumably referring to a block of twenty-two people in District 11. However, he did not alert the court as to whether such a block actually existed, whether it could be "traded" without splitting a precinct along something other than an easily recognizable boundary, or how he would have solved the corresponding population deviation that would inevitably be created in the neighboring District 11 were such a trade possible. Mr. Tyson's testimony does nothing to cast doubt upon what the court heard from Ms. Meggers, someone who has been recognized as "probably the single most knowledgeable person available on the subject of Georgian redistricting." *Johnson v. Miller*, 864 F.Supp. 1354, 1361 (S.D.Ga.1994) (three-judge court). Accordingly, the court finds that the state's legitimate interests were consistently applied. Given the relatively small total deviation of only seventy-two people and the importance of the state's interest in avoiding voter confusion, we find that the congressional districts do not violate plaintiffs' rights under the one-person, one-vote principles of Art. I, § 2.

Moreover, it is immaterial that a "better" plan might have been possible. *See Karcher*, 462 U.S. at 739 n. 10, 103 S.Ct. at 2663 n. 10 (rejecting the argument that a plan cannot represent a good faith effort whenever the court could conceive of minor improvements). If that were the determining factor, the court's analysis would necessarily end after deciding that the plaintiffs satisfied their burden of showing the plan was not the result of a good faith effort to create a plan with a zero deviation. However, that is not the proper standard. *Id.* at 730–31, 103 S.Ct. at 2658–59 (explaining that in such a scenario, the court must examine the defendant's reasons for the deviation). Given the flexible nature of the analysis used to evaluate defendant's explanations for the deviation, *see id.* at 741, 103 S.Ct. at 2664; *Anne Arundel County Republican Cent. Comm. v. State Admin. Bd. of Election Laws*, 781 F.Supp. 394, 397 (D.Md.1991) (three-judge court) ("[T]he amount and degree of justification which the State must establish is roughly equatable to the deviation itself."), we reject the plaintiffs' one person, one vote challenge to the Congressional Plan.

We should add that the congressional districts produced by the State of Georgia, though constitutional under the standards espoused in *Karcher*, reveal a process dominated by the personal interests of individual legislators and not by the traditionally recognized redistricting criteria. For example, one need cast only a passing glance upon Georgia's congressional districts to realize that something other than a simple desire to create compact districts motivated the final product.[17] As we have

---

**17.** In *Karcher*, the Court recognized that the one-person, one-vote jurisprudence does little to prevent the effects associated with political gerrymandering. 462 U.S. at 734 n. 6, 103 S.Ct. at 2660 n. 6. Although this court found

noted, compactness is one factor the Supreme Court has recognized as a potential justification for a population deviation. *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663. Plaintiffs' expert Dr. Keith Gaddie testified that the Congressional Plan is not compact and is considerably less compact than the plan used in the 1990's. Gaddie Report at 13–14, Table 4.1. Indeed, the final map reveals an oddly shaped district with "fingers" that appear to extend from one central point; a district that is relatively wide, narrows, and then widens again; and several districts which simply defy explanation.

It is further evident that the state had little desire to continue its previous practice of not splitting counties except when absolutely necessary. The plan at issue in this case splits thirty-four counties, only six of which had been split by the state in past congressional plans. Not surprisingly, the worst offending districts are also the ones that are the least compact. District 8 encompasses portions of nineteen counties, only three of which are whole. District 11 touches seventeen counties, seven of which are whole. District 13 touches eleven counties, none of which is whole. Only the personal desires of individual legislators could explain the contours of those districts. Furthermore, the General Assembly made no consistent effort to protect incumbents. Although the number of districts increased from eleven to thirteen, four of the eight existing Republican representatives were paired in districts such that they would have to run against each other. No Democrat was paired against another.

In the end, though, we are left with a congressional plan that has a total deviation of only seventy-two people out of a total population of 8,186,453 and an average district population of 629,727. As the Supreme Court has held, the showing required to justify population deviations is proportional to the size of the deviations. *See Karcher,* 462 U.S. at 741, 103 S.Ct. at 2664. The deviation in the Georgia Congressional Plan is very small indeed. This deviation was supported by the rational state interest of wanting to avoid further precinct splits along anything other than easily recognizable boundaries. The parties agreed that those seventy-two people did not result in any partisan advantage for either Democrats or Republicans, and the size of the deviations, which are minuscule compared to the populations of the districts, can lead to no other conclusion. Accordingly, the plaintiffs' claim that the Congressional Plan violates the one person, one vote standard of the United States Constitution fails.

### III. Conclusion

For the foregoing reasons, we find in favor of the plaintiffs on their claim that the House Plan and the 2002 Senate Plan violate the Fourteenth Amendment's Equal Protection Clause based on the one person, one vote principle, and we find in favor of the defendant on the plaintiffs' claim that the Congressional Plan violates Article I, § 2 based on the one person, one vote principle.

 Because we have determined that the House Plan and the 2002 Senate Plan violate the Equal Protection Clause, we enjoin the defendant from any further use of those plans in any future elections. We retain jurisdiction of this action, however, in order to permit the Georgia General Assembly to submit to the court, by no later than *March 1, 2004,* enacted plans for reapportionment of the state

---

that the drafters' conduct did not rise to the level of *unconstitutional* partisan gerrymandering, it is likewise clear that there was at least some degree of gerrymandering in the Congressional Plan.

House and Senate that are acceptable to the legislature and consistent with this opinion. We urge the General Assembly to use this opportunity to adopt new plans. The Supreme Court has repeatedly held that the business of "redistricting and reapportioning legislative bodies is a legislative function which the federal courts should make every effort not to preempt." *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). "When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Id.* at 540, 98 S.Ct. at 2497. "Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993); *see also Ramos v. Koebig,* 638 F.2d 838, 844 (5th Cir.1981) (holding that absent "the imminence of ... elections, or some other exigency," district court should give the legislature opportunity to enact a valid reapportionment).

We also urge the General Assembly to simultaneously submit those plans to the Attorney General for expedited administrative preclearance pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. If new state legislative plans have not been adopted by March 1, 2004, or if the Attorney General indicates that preclearance will not be completed in time for candidate qualifications, the plaintiffs may petition this court to draw an *interim* plan for use in the upcoming election cycle. *See Reynolds,* 377 U.S. at 585–87, 84 S.Ct. at 1393–94

(approving the district court's decision to first give legislature opportunity to adopt plan, and then, when legislature failed to act effectively in remedying constitutional deficiencies, to implement interim court-ordered plan).

**Judgment**

This action having come before this three-judge district court, The Honorable Stanley Marcus, United States Circuit Judge; The Honorable Charles A. Pannell, Jr., United States District Judge; and The Honorable William C. O'Kelley, Senior United States District Judge, the court enters judgment pursuant to Rule 54(b) as follows:

Judgment is entered in favor of the defendant and against the plaintiffs on (1) Count I (Violation of Right to Equal Protection of the Laws), insofar as the plaintiffs have alleged that Georgia's congressional and state legislative reapportionment plans are an unconstitutional partisan gerrymander and that the reapportionment plan for the Georgia House of Representatives represents an unconstitutional combination of single- and multi-member districts, (2) Count II (Violation of First Amendment Rights), (3) Count III (Violation of Article I, § 2 of the United States Constitution), and (4) Count IV (Violation of 2 U.S.C. § 2).

Judgment is entered in favor of the plaintiffs and against the defendant on Count I (Violation of Right to Equal Protection of the Laws), insofar as the plaintiffs have alleged that Georgia's state legislative reapportionment plans violate the one person, one vote principle.

Accordingly, the defendant is hereby ENJOINED from using in any future elections either the reapportionment plan for the Georgia House of Representatives that was signed into law on October 1, 2001, or the reapportionment plan for the Georgia

Senate that was signed into law on April 11, 2002.

That portion of Count I alleging that the 2002 reapportionment plan for the Georgia Senate is an unconstitutional racial gerrymander is MOOT, as the relief sought by the plaintiffs is granted for other reasons. Consideration of that portion of Count I alleging that the 2001 reapportionment plan for the Georgia Senate is an unconstitutional racial gerrymander is STAYED until the United States District Court for the District of Columbia issues a final order in the preclearance proceedings relating to the 2001 plan or until a new Georgia Senate reapportionment plan is enacted which repeals the 2001 plan.

The court will retain jurisdiction of this action for such other and further orders as may be necessary.